## Burgan, et al. v. White, et al.

(Decided February 10, 1928.)

### Appeal from Hancock Circuit Court.

1. Mines and Minerals.—Evidence held sufficient to sustain finding of chancellor that accounting had between members of partnership for drilling oil wells was complete settlement of accounts.

2. Appeal and Error.—Finding of chancellor that parties to agreement concerning development of oil and gas lease did not subsequently enter written agreement for general partnership held conclusive on Court of Appeals, where evidence was conflicting.

3. Mines and Minerals.—Evidence held to sustain finding of chancellor that parties to agreement for development of oil lease did not subsequently form general partnership.

4. Mines and Minerals.—Evidence held to show that parties to agreement concerning development of oil and gas lease subsequently entered partnership for drilling of oil wells, and that partnership agreement did not preclude any partner from buying any oil lease that he might desire with his own funds for himself.

5. Mines and Minerals.—Members of partnership for drilling of oil wells held to have no interest in oil lease purchased by other partners with their own funds for themselves, where partnership agreement did not preclude any partner from buying any oil lease that he might desire with his own funds for himself.

6. Trusts.—Evidence held to sustain finding of chancellor that certain partners did not divert partnership funds to own oil well so as to raise trust therein in favor of partnership.

7.  Partnership.—General rule is that partner is not entitled to charge
    partnership for his services, in absence of express agreement for
    compensation or peculiar circumstances, but is relegated to his
    share of the profits.

8.  Partnership.—Partner who claims wages for services to partner-
    ship has burden of showing express agreement for such wages,
    or at least those peculiar circumstances which will warrant allow-
    ance of compensation.

9.  Mines and Minerals.—Evidence held to show express agreement
    between members of partnership for drilling of oil wells that
    salary should be paid to member of partnership who left his em-
    ployment and went to work on oil leases.

10. Mines and Minerals.—Evidence held not to show agreement be-
    tween members of partnership for drilling of oil wells which
    would entitle partner to salary from partnership, since showing
    at best only agreement to pay salary should partnership be able
    to do so, and partnership was never able to do so.

11. Appeal and Error.—Error in giving certain members of oil
    drilling partnership insufficient credits in casting accounts held
    not harmless on ground that these partners failed to account for
    proceeds of interests in oil leases, since liability for such pro-
    ceeds had been disposed of by prior settlement between parties.

12. Mines and Minerals.—Court of Appeals must presume that mem-
    bers of partnership for drilling of oil wells considered liabilities
    of certain members of partnership for proceeds of sale of interests
    in oil leases when they made complete settlement of accounts
    between themselves.

13. Mines and Minerals.—Evidence held not to support finding as to
    indebtedness between members of partnership for drilling of oil
    wells who were seeking accounting.

AUGUST WALZ and WM. R. SCHNEIDER for appellants.

M. L. HEAVRIN, G. D. CHAMBERS and E. B. ANDERSON for
appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirm-
ing in part and reversing in part.

On the 18th day of September, 1922, the appellants
Ostos Pogue and C. F. Landuyt, together with A. O.
Archer, entered into the following contract with the ap-
pellees D. J. White and D. H. Nicklin:

"St. Louis, Missouri, September 18, 1922.

"Know all men by these presents: That A. O.
Archer, Ostos Pogue, H. D. Nicklin, D. J. White,
and C. F. Landuyt, all of the city of St. Louis, state
of Missouri, have purchased of the Sewell Well

Company, of the city of St. Louis, state of Missouri, a Keystone oil well drilling machine No. 5, with stem, bits, cables, casing and other drilling appurtenances, for the sum of $2,972.50, of which sum each of the above-named parties paid the one-fifth part thereof, and are owners therein accordingly, each the one-fifth part thereof. That said drilling outfit has been shipped to Hancock county, state of Kentucky, for the purpose of drilling a well for oil on the farm of G. W. Newman and wife, evidenced by an oil and gas lease thereon, which farm and lease contains 230 acres, and which lease is of record on page 482, volume 5, Lease Records of said Hancock county. That A. O. Archer, the owner of said oil and gas lease, has transferred and delivered to said Ostos Pogue, H. D. Nicklin, D. J. White, and C. F. Landuyt their several interests in said oil and gas lease.

"That further said A. O. Archer, the owner thereof, has transferred and delivered to said D. H. Nicklin, as trustee, the oil and gas lease on the farm of J. J. Hennen and wife, containing 300 acres, which lease is recorded at page 518, volume 5, Lease Records of said Hancock county, state of Kentucky, adjoining the Chambers farm on the west, and that said D. H. Nicklin is hereby authorized to sell, transfer and convey said J. J. Hennen lease in undivided interests of one-sixteenths and one-eighths therein, for the price of $250 per undivided one-sixteenth and $500 per undivided one-eighth therein.

"That of the sum of money received by said H. D. Nicklin, trustee, for the sale of said interests, he is hereby authorized and directed to pay out same for the expense of drilling the above set out well for oil, and the necessary expense attendant thereto.

"That upon the sale of said interests and the receipt of moneys therefor, said H. D. Nicklin shall deposit same in a bank to his credit, as trustee, and shall pay out same by check signed by H. D. Nicklin, trustee, and countersigned by Ostos Pogue, for the payment of bills which must be O. K.'d by A. O. Archer and D. J. White, and, in the absence of A. O. Archer, by D. J. White. The holding of such bills O. K.'d by A. O. Archer and D. J. White, or, in the absence of A. O. Archer, by D. J. White, and the canceled check signed as above, shall be a full receipt for

said H. D. Nicklin and Ostos Pogue, for the payment of said moneys.

"Signed by us in each other's presence, this 18th day of September, 1922.

"A. O. Archer.
"D. J. White.
"Ostos Pogue.
"H. D. Nicklin.
"C. F. Landuyt."

We shall refer to this contract hereafter as the contract of September, 1922.

Pogue and Landuyt were street car motormen in the city of St. Louis, and White was a railroad man working in the railroad yards at East St. Louis, Ill. Archer had practiced law, and had had a good deal of experience in the buying and selling of oil leases and in their development. All of these parties at this time were interested in other oil companies developing the Hancock county field in Kentucky, although they were not all interested in the same companies. This was known to them all. Pursuant to the contract set out above, drilling machinery was sent to Hancock county, and White and later Nicklin were sent by the parties to Hancock county to assist, and probably supervise, the drilling of the well on the Newman lease. The funds necessary for this purpose were raised by contributions or assessments on the part of the parties to the contract, and from the proceeds of the sale of interests in the Hennen lease. When White and Nicklin in Hancock county were out of money, they would call on their associates in St. Louis, who would forward them the necessary funds. The well on the Newman lease was drilled, and came in dry.

The Hancock County Oil & Development Company, a common-law trust, in which Pogue, Landuyt, and others were interested, owned a number of oil leases in the vicinity of the Newman lease, and especially did it own the lease known as the Curry lease. Another common-law trust known as the Indian Hill Development Company, in which some of these parties, together with others, were interested, likewise owned leases in this neighborhood. After the Newman well came in dry, a contract was entered into between the Hancock Oil & Development Company and the association constituted by the contract of September, 1922, to drill a well on the Curry lease. The

Hancock Company agreed to pay the association $2.50 a foot for drilling this well, which was to be drilled to a depth of 700 feet, unless the Barlow sand was sooner reached. White seems to have been in charge of the drilling of this well known in this record as Curry No. 1 well. After White had drilled the well to 610 feet, he and those with whom he was working came to the conclusion that it was a dry well, and, although he had not yet reached the Barlow sand, nor had he drilled the well to a depth of 700 feet, he decided to abandon it. This he did, pulled the casing, and plugged the well, as the statute in this state requires one to do. White then went to St. Louis, and reported his actions to his associates. They thereupon became very much incensed, and demanded that White return to Hancock county, clean out the well, and drill it on down to the depth required by the contract. They sent back with White an experienced driller. When White and the driller reached Hancock county, they took the plugs out of the Curry well, and attempted to drill it deeper, but, after going some 70 feet further, they abandoned all efforts on this well, and started another well known as Curry No. 2. This well, too, proved to be dry.

There is a big dispute in the evidence whether this well was to have been drilled exclusively at White's expense or at that of the parties to the September, 1922, contract. The chancellor found that it was to be at the expense of the association, and we cannot say that the evidence does not support that finding. There is also quite a dispute about the way this Curry No. 2 well was drilled; the appellants claiming that White drilled it in such fashion that it was bound to prove abortive. They say that his purpose in doing this was in order that he might discourage his associates, get them to abandon their project, and then he could buy up the oil leases in the neighborhood at an attractive price. White denies all this, and claims that he drilled the Curry No. 2 well in the best of faith, and to the best of his ability. After a careful reading of this record, we are of the opinion that White is correct, in this, that the unsuccessful drilling of the three wells in question was not due to any effort on the part of White to defraud his associates, but mainly on account of his inexperience and inefficiency in the drilling business. The parties were all along having a very hard time to finance their drilling operations.

They were men of exceedingly limited financial resources, and Mr. Pogue, who was acting as treasurer and keeper of the records of this association, was not an experienced bookkeeper. A good deal of quarreling went on between the parties concerning the way drilling operations were being conducted, and a good deal of irritation arose between them in connection with the raising and disbursements of funds.

In February, 1923, White and Nicklin came to St. Louis, and they and their associates in the September, 1922, contract, entered into an accounting of their past financial operations. White and Nicklin contend that by this accounting a full and complete settlement was had between the parties of all their financial collections and disbursements up to that time, and that by the terms of that settlement it was ascertained that Archer, Pogue, and Landuyt each owed White and Nicklin $240. They say that, to take care of his part of this ascertained balance, Archer transferred his interest under the contract of September 18, 1922, to White. It may be said in passing that White later sold this interest to the appellant Burgan, who by consent of all the parties took Archer's place in the arrangement then existing between the parties. Pogue paid $70 on the $240 he owed, and Landuyt paid $110. The appellants here strenuously insist that, although the parties did have an accounting in February, 1923, it was not intended to be a complete settlement of their financial responsibilities to each other. The master commissioner to whom this case was referred and the chancellor, however, found that it was such a settlement, and we are of the opinion that in so finding they were correct, because it is very hard to believe that Archer, Pogue, and Landuyt would have made the payments on the balances found against them they did, and which they concede, unless they felt at that time a complete settlement had been had, and that such balances were due from them.

After this settlement in February, Curry well No. 2 was finished. A great deal of expense was incurred in the drilling of that well, and a great many financial transactions between the parties were had after the February settlement. After Curry well No. 2 was abandoned, nothing seems further to have been done until the appellants herein discovered that White and Nicklin had gone over into Ohio county, had taken in their own name a

lease called in this record the Burdett lease, had moved over to this Burdett lease the drilling machinery bought under the contract of September, 1922, and some casing belonging to the association, and had drilled on this Burdett lease a producing well. Thereupon the appellants brought this suit alleging a partnership among all of the parties, calling for an accounting, and asking that they be adjudged an interest in the Burdett lease. By their pleadings the parties presented their respective contentions as to the items to be included in the accounting. The appellees also resisted the appellants' claim to any interest in the Burdett lease. On final hearing, after a reference to the master commissioner, the chancellor confirmed the commissioner's report, which found that the appellants were indebted to the appellees in the sum of $404.88, and that the appellants had no interest in the Burdett lease, and entered judgment accordingly. From that judgment this appeal is prosecuted.

It is contended by the appellants that, although the contract of September, 1922, did not constitute them general partners in the purchase, sale, and development of oil leases generally, yet that thereafter such a general partnership arose either expressly or by implication. They based their argument that a general partnership arose expressly on the claim that in December, 1922, all of these parties entered into another contract to that effect in St. Louis, which contract was reduced at that time to writing, and signed by them all. They further claimed that this writing which was in the custody of Pogue was destroyed in a fire which burned Pogue's house. White and Nicklin deny that they ever entered into any such contract. They produced proof to substantiate their claim that, at the time this alleged contract was entered into and signed, they were in Hancock county, Ky., many miles away.

The circumstances under which the appellants say this alleged contract was signed are somewhat peculiar, and, as the evidence is very conflicting as to whether the parties entered into such a contract or not, we are obliged to accept the court's finding below that no such contract was entered into. However, the conduct of the parties subsequent to the drilling of the Newman well forces us to the belief that some kind of a partnership beyond that expressly constituted by the contract of September, 1922, arose between the parties. The contract of Sep-

tember, 1922, contemplated only the development of the Newman lease, which was owned by the parties to the contract, and yet admittedly the parties undertook the development of the Curry lease for the Hancock Oil & Development Company. They knew that they were doing this, and, indeed, they had a settlement in February of all their expenditures and receipts up to that time which covered, not only the development of the Newman lease, but also the drilling of the Curry No. 1 well. On the other hand, it is conceded that these parties were all with the knowledge and acquiescence of one another interested in various other oil companies. They do not seem to have contemplated that they should all be interested together in the same companies. They owned no lease but the Newman lease. They bought together no other lease. After abandoning the development of the Newman lease, they engaged solely in drilling operations on leases owned by other companies in which some, but not all, of them were interested. Their conduct then indicates that inter se they were in the main a partnership for the drilling of oil wells, and that no one of them was precluded by their partnership agreement from going out and buying with his own funds and for himself any oil lease that he might desire.

In such a state of case, if White and Nicklin purchased the Burdett lease with their own funds, and for themselves, the appellants would have no interest in it. Dishman v. Umberhour, 194 Ky. 772, 241 S. W. 62. Appellants insisted, however, that the proof demonstrates that the drilling of the wells on the Newman and Curry leases did not cost anywhere near what White and Nicklin claimed they did, and that, in truth, White and Nicklin had bought and developed the Burdett lease with funds furnished them by their associates for the drilling of the wells on the Newman and Curry leases, and which they had not used for that purpose. From this, it is argued that White and Nicklin perpetrated a fraud on the partnership, and must be held as owning the Burdett lease in trust for the partnership. It is true that the drilling of the wells on the Newman and Curry leases was done at a cost far greater than it would have been had such drilling been let out at private contract to experienced drillers. But, on the other hand, it must be remembered that all of these partners were profoundly ignorant of the business of drilling and developing oil

leases, and a reading of this record convinces us that the great cost of the Newman and Curry wells was due to the inefficiency and lack of knowledge on the part of White and Nicklin rather than to any diversion of funds by them.

When the parties made the February settlement, the appellants made no contention that White and Nicklin had not honestly spent the money they claimed to have spent in the drilling of the Newman and Curry wells. White and Nicklin presented in this case an itemized list of their expenditures for the partnership since the February settlement, and the appellants failed to show where any material part of them was not so expended. Further, White and Nicklin show where they got the funds for the development of the Burdett lease, and although some suspicion is cast on the good faith of this proof, yet we cannot say that the commissioner and the chancellor erred in finding that no part of the funds of whatever partnership existed between the parties to this lawsuit was traced into the purchase or development of the Burdett lease. It results, therefore, that the judgment of the lower court, in so far as it decided that the appellants had no interest in the Burdett lease, is correct, and it is affirmed.

On the accounting between the parties hereto, the commissioner found that, balancing the accounts between them from the February settlement to the time when all work on the Curry lease was abandoned, there was a net balance due the appellees from the appellants of $404.88. He arrived at this result first by calculating the disbursements made by White and Nicklin and salaries claimed by them, all amounting to $2,150.55. This amount included the $300 due from Pogue and Landuyt to the appellees on the February, 1923, settlement, so that the real disbursements made by appellees come to the sum of $1,850.55. In the items going to make up these disbursements were two which are particularly attacked by the appellants; one being that of $117 for wages claimed by White, and the other being for $486 for wages claimed by Nicklin. It is undoubtedly the general rule in the law of partnership that, in the absence of express agreement or peculiar circumstances, a partner is not entitled to charge the partnership for his services; he being relegated to his share of the profits for such remuneration. Bemiss v. Widows' & Orphans' Home of the

Christian Church of Kentucky, 191 Ky. 316, 230 S. W. 310. It therefore devolves on a partner claiming wages to show such an express agreement, or at least those peculiar circumstances which in some cases have warranted the court in allowing compensation. As to White, the evidence clearly shows that the partners did agree to pay him a salary. He was a man of limited means working in the railroad yards at East St. Louis. By an agreement between him and his associates he quit his work there, and went to Hancock county to work on these oil leases; his associates remaining in St. Louis, and continuing in their work of motormen. He testified that they agreed to allow him as wages what he had been earning in the railroad yards, and we believe the surrounding circumstances and the admissions of Pogue corroborate him. We think the commissioner did not err in allowing this item of $117.

As to Nicklin, however, he himself in his testimony admits that he "never had any agreement about charging for labor other than when I came down here and was losing my time in St. Louis, and they said, if the company was ever able, they would allow me a salary." At the best, this shows only an agreement to pay Nicklin a salary in the event the company was ever able, and this record overwhelmingly demonstrates that the company was never able to do so. The commissioner should have disallowed this item. By doing so, we find that the sums disbursed by White and Nicklin amount to $1,364.55 instead of $1,850.55, as found by the commissioner. The proof shows, and the commissioner found, that the appellants in St. Louis sent to the appellees in Hancock county moneys from time to time aggregating the sum of $1,475.73. Of this sum, an item of $130 represents a donation made to this partnership by the Indian Hill Development Company and the Hancock Oil & Development Company, and another item of $159.50 represents the proceeds of a sale of some casing belonging to the firm. These two items amount to $289.50. Deducting this sum of $289.50 from the $1,475.73, we have the net sum of $1,186.23 sent by the appellants to the appellees. The record shows that the appellees furnished no part of this $1,186.23, and the commissioner in giving the appellants credit for only three-fifths of this amount erred. The appellees, while admitting that the commissioner erred in this regard, insist that the error was harmless, be-

cause, as they say, the appellants have never accounted for what they received from the sale of the Hennen lease and some interests in the Newman lease, both of which leases were mentioned in the contract of September 15th. They say, while the proof fails to show accurately what the appellants received from the sale of interests in the Hennen and Newman leases, yet it does show that they received enough to overbalance any error the commissioner made in allowing credit for only three-fifths of the sum of $1,186.23. The appellees fail to note, however, that the proof also shows that the interests in the Hennen and Newman leases were disposed of prior to the settlement of February, 1923.

As we have seen, this settlement was a complete one of the accounts of the parties up to that time, and we must presume, in the absence of an attack on that settlement by the appellees, that the parties took into consideration, in the adjustment of their accounts at that time, this matter of the disposition of the interests in the Hennen and Newman leases, and that the appellants accounted in that settlement for the proceeds of such disposition. It results therefore that the appellees owe the appellants for their two-fifths of this $1,186.23 furnished by the appellants out of their pockets. This two-fifths amounts to $474.48. As stated, the appellees disbursed the sum of $1,364.55. To cover this amount, the appellants sent them the sum of $1,186.23 out of their own pockets, and the sum of $289.50 representing donations and sales of casing. This left an excess of money sent the appellees over their disbursements of $111.20, of which two-fifths were theirs, if we charge them with their part of the $1,186.23. Their part of the $1,186.23 is $474.48, as we have seen. Their part of the $111.20 is $44.48, leaving appellants' part $66.72. Adding this $66.72 to the $474.48, we have the sum of $541.20 due from appellees to appellants. To this must be added two-fifths of the sum of $866.75. This latter sum represents an aggregate of moneys which the proof shows the appellants spent out of their own pocket in St. Louis and elsewhere for the firm, in addition to the funds sent by them to the appellees in Hancock county. The items going to make up this sum are set out on pages 52 and 53 of the record herein, beginning with the item of March 5, 1923, cash $365. These items which total $1,274.75 are clearly established by the proof, except the first two items of $365

and $43, or $408, which we believe are covered by other items, and for which the appellants should not receive credit. Deducting the aggregate of these two items, that is, $408, from the $1,274.75, we have the net of $866.75. Two-fifths of this $866.75 amount to $346.70, and, adding this to the $541.20 previously found due from the appellees to the appellants, we have the sum due the latter from the former of $887.90. From this must be deducted the $300 due from Pogue and Landuyt to the appellees under the settlement of February, 1923, leaving the net amount due from appellees to the appellants of $587.90.

We thus find that the judgment of the lower court adjudging that the appellants were indebted to the appellees is erroneous, and that it should have found the appellees indebted to the appellants in the sum of $587.90. In so far, then, as the judgment of the lower court awarded the appellees a judgment against the appellants in the sum of $404.88, it is reversed, with instructions to award the appellants a judgment against the appellees in the sum of $587.90, with interest from January 21, 1925, until paid. In all other respects said judgment is affirmed. The costs of this appeal will be paid, one half by the appellants, and the other half by the appellees.