# DECEMBER, 1946

## THOR WARNER v. WM. H. WINN.

No. A-915. Decided November 6, 1946.
Rehearing overruled December 4, 1946.
197 S. W., 2d Series, 338.)

*G. C. Mann,* of Laredo, *W. H. Kennon,* and *Johnson & Rogers,* all of San Antonio, for petitioner.

The Court of Civil Appeals erred in holding that when petitioner acquired the lease to Share 4 in the Lopena Gas Field, that an equitable right of title to two-thirds of the gas rights in said share vested in the respondent by virtue of a constructive trust.

The Court of Civil Appeals also erred in holding, as a matter of law, that the finding of the Court, on a former appeal, that "the contract was in writing and complete in every respect and it would varry its written terms by parol testimony to show that the joint adventure applied to other leases than those fully described in the contract," was dicta. MacDonald v. Follett, 142 Texas 616, 180 S. W. (2d) 334; Grisby v. Reib, 105 Texas 597, 153 S. W. 1124; Franklin v. Cassady, 62 Texas 418.

*C. M. Gaines* and *Arnold & Cosby,* all of San Antonio, for respondent.

On the question of the fiduciary relation of the parties as partners or joint adventures, and a breach of such obligations, cited. Slama v. Mills, 116 S. W. (2d) 426; Corona Petroleum Co. v. Jameson, 146 S. W. (2d) 512; Hestand Kimbell Gro. Co. v. Forrest, 151 S. W. (2d) 882.

MR. JUSTICE SMEDLEY delivered the opinion of the Court.

Petitioner Warner sued respondent Winn for damages, both actual and exemplary, alleging that respondent slandered his title to an oil and gas lease, executed by C. P. Quinlan, of 41.66 acres of land known as Share 4 in the Lopena Gas Field in Zapata County, by making and filing for record an affidavit falsely asserting that respondent by agreement with petitioner was entitled to an assignment of a two-thirds interest in the gas rights under the lease.

The jury found that the execution and recording of the affidavit "was the proximate cause of plaintiff being prevented from commencing the drilling of a well for gas on Share 4 prior to June 15, 1940" and that respondent in executing and causing the affidavit to be recorded was actuated by malice and did not act in good faith. It found the amount of actual damages to be $23,000.00 and awarded $11,500.00 as exemplary damages. Judgment was rendered by the trial court in accordance with the verdict.

The principal defense made by respondent is that the affidavit was true, in that by reason of the relation of the parties and the undisputed facts in the record he had become, before the affidavit was filed, the owner of an equitable right or title

to a two-thirds interest in the gas rights under the lease of Share 4. The Court of Civil Appeals sustained this defense, reversed the trial court's judgment and rendered judgment for respondent. 193 S. W. (2d) 867.

On February 2, 1937, petitioner Warner, as owner, and respondent Winn as operator, executed a written contract, which is set out fully in the opinion of the Court of Civil Appeals. The most important provisions of the contract are as follows: The owner has sold and assigned to the operator an undivided two-thirds interest in certain oil and gas leases of certain lands in Zapata County, in so far as the same cover all mineral conveyed by the leases, except oil and oil rights, which are reserved by the owner, it being recited that the rights and interests therein conveyed are expressly set out in the assignment executed and acknowledged on the date of the contract. Then follows this provision: "and this agreement relating to and governing the rights of the parties in the operation, maintenance, management and control of said premises, and such assignment and this agreement together constituting the full agreement between parties hereto, and such oil, gas and mineral leases in which the rights, title and interests have been assigned by owner to operator are as follows:" The quoted provision is followed by a full description of each of the seven leases in separate paragraphs, giving as to each lease the date, a description of the land, the number of acres, and the book and page where recorded. The contract does not describe the lease on Share 4 and makes no reference to it. The operator agrees within fifteen days from the date of the contract to commence the drilling of a well at a location on the land described in the contract to be agreed upon by owner and operator, and to drill the well with diligence "to the present gas producing horizon of gas wells now producing gas in the vicinity of such leases, which horizon is approximately 2,350 feet." The operator agrees within thirty days after the first well is completed to begin the drilling of a second well, and to complete it in the same manner. After completion of the two wells the operator will drill a third well and a fourth well when in his judgment the market demand justifies drilling them. Expenses in connection with the operation and maintenance of the wells, except the drilling and completion of the first four, shall be borne two-thirds by the operator and one-third by the owner, and the wells shall belong jointly to the owner and operator under the terms of the agreement. Net profits from wells on the premises shall be divided between the owner and the operator, three-fourths to the operator and one-fourth to the owner, until

the cost and expenses of completing the first four wells shall have been returned to the operator, and after he has been so repaid the net profits shall be divided two-thirds to the operator and one-third to the owner. Elaborate provisions are made for the protection of the owner in the oil reserved by him. The contract has twenty-two separate paragraphs, sets out in detail the rights and obligations of each of the parties, and contains the agreements usually appearing in operating contracts for the protection of both parties.

On the day when the contract was executed, petitioner executed and delivered to respondent an assignment of a two-thirds interest in each of the oil and gas leases described in the contract, with reservation, however, of the oil and all oil rights.

The Lopena Gas Field covers about 2,900 acres of land, and when the contract between petitioner and respondent was made there were ten producing gas wells in the field. There were twenty-two producing gas wells in the field at the time when this case was tried. After the execution of the contract Winn drilled four wells on the land described in the contract and the assignment, from which gas was produced and sold in large quantities, and receipts from the gas were applied to the expenses of development and operation, and the profits were shared by petitioner and respondent in the manner and proportions directed by the terms of the contract.

At the time when the contract and the assignment above referred to were executed, petitioner Warner was the owner of an oil and gas lease on Share 4 containing 41.66 acres, which lease, executed June 15, 1934, was for a term of five years, with all rentals paid in advance. Warner testified that the title was defective because one of the four lessors was not joined by her husband in the execution of the lease.

When C. P. Quinlan became the owner of Share 4 subject to the lease held by petitioner, the defect in the title was cured, and a short time before that lease expired Quinlan, without the payment of a cash consideration, executed and delivered to petitioner on May 8, 1939, an oil and gas lease of Share 4 for a term of one year from June 15, 1939, and as long thereafter as oil or gas might be produced from the land. This lease contained the limitation that it would terminate as to both parties if no well was commenced on the land on or before June 15, 1940.

The affidavit of respondent, in which he asserted that he was entitled to an assignment of a two-thirds interest in the gas rights of the leasehold interest in Share 4, was filed for record on February 1, 1940. Petitioner, after procuring the second lease, that executed by Quinlan, entered into a written contract with H. L. Skaggs on January 18, 1940, for the drilling of a gas well on Share 4, the contract providing that actual drilling should begin on or before February 10, 1940, and should continue diligently to completion, and assigning to Skaggs one-half of the gas rights under the lease, with reservation to petitioner of a seven-sixteenths overriding royalty in the gas. Skaggs, who was financially able to drill the well, promptly went upon the land and cleared the location. Before beginning actual drilling, however, he discovered the affidavit which respondent had filed for record, and because of the claim made in the affidavit refused to drill the well. Thereafter petitioner made agreements with two other contractors for the drilling of a gas well on Share 4, and both refused to drill because of respondent's affidavit. After the lease from Quinlan to petitioner terminated for failure to commence drilling a well on or before June 15, 1940, Skaggs drilled a producing gas well on Share 4 for Thompson, a subsequent lessee.

The Court of Civil Appeals in its elaborate and careful opinion, after a full statement of the facts, expressed the conclusion that petitioner and respondent were engaged in a joint venture, the common enterprise of producing and selling gas from the Lopena Field. It quoted from Corpus Juris the important and generally recognized equitable rule that persons engaged in a common enterprise by way of joint adventure stand, within the scope of the enterprise, in a fiduciary relation each to the other and are bound by strict standards of good conduct and fair dealing the one to the other; that neither of the members can obtain any secret profit or advantage for himself; that neither can, without the consent of the other, engage in any individual operations harmful to the business, or acquire any interest in the property employed in the venture antagnostic to the interest which they have in it. 33 C. J. pp. 581-852. The quotation is followed in the opinion by the citation of Whatley v. Cato Oil Company, 115 S. W. (2d) 1205, the note in 62 A. L. R., pp. 13 and following, and Binford v. Synder, 144 Texas 134, 189 S. W. (2d) 471. The opinion of the Court of Civil Appeals states that the exact question presented for decision is, "Did such fiduciary relation constitute the basis for the application of the doctrine of constructive trust to the Quinlan lease?" It answers the question in the affirmative in its final conclusion that "when

Warner took a renewal of the Quinlan lease and attempted to appropriate it to his own use and benefit and to the detriment of his co-adventurer, Winn, he grossly violated the duty and obligation that he owed to Winn," and that equity would impres a trust upon the leasehold estate in Share 4 for the benefit of Winn to the extent of the interest that he had under the contract in the ther leases, thus giving verity to Winn's affidavit.

The equitable rule has been given approval and has often been applied by the courts of this state and of other states. Johnson v. Peckham, 132 Texas 148, 120 S. W. (2d) 786, 120 A. L. R. 720; Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Texas 565, 160 S. W. (2d) 509; Slay v. Burnett Trust, 143 Texas 621, 187 S. W. (2d) 377; Meinhard v. Salmon, 249 N. Y. 458 N. E. 545, 62 A. L. R. 1; 30 Am. Jur. pp. 695-703, Secs. 34-49; Bogert's, The Law of Trusts and Trustees, Vol. 3, pp. 127-133, Sec. 488.

■ It is our opinion, however after careful consideration of the entire record and the briefs, that this case in its facts is not a case for the application of the rule. We believe that the decision of the Court of Civil Appeals is erroneous in failing to attach significance to the narrow scope of the enterprise as defined by the contract which created it. The opinion of that court states that the parties "within the scope of the enterprise of producing and selling gas from the Lopena Field stood in a fiduciary relation to each other." The parties did not undertake to engage generally in the production and sale of gas from the Lopena Field. The extent of their enterprise or joint adventure was carefully defined by the contract. It contemplated and provided for the development of certain specified and carefully described areas held under certain named and well identified leases and for the production and sale of gas from the several tracts of land described in those leases. The subject matter of the enterprise, the property employed in the joint adventure, was those leases, the land described in them, and the gas under the land. The contract neither described nor referred to Share 4 or the leasehold interest in that land. It is significant that the contract expressly provided that the contract and the assignment together constituted the full agreement between the parties.

■ Most of the statements of the rule speak of the existence of a fiduciary relation and the duty of fair dealing *within the scope of the enterprise or with respect to the property related to or employed in the enterprise.* 33 C. J. p. 851, Sec. 36; 30 Am. Jur., p. 696, sec. 34; Note 62 A. L. R. pp. 13-14, 24-27. And in most

of the cases where the rule has been successfully invoked one of the parties has undertaken to acquire for his own benefit property belonging to the enterprise or to use its property or funds for himself. In Whatley v. Cato Oil Company, 115 S. W. (2d) 1205, cited by the Court of Civil Appeals and by respondent, one of the parties to a joint adventure for the drilling of a well on certain land used proceeds of the joint enterprise as the consideration for a lease that he procured for his own benefit and in his own name on other land. Binford v. Snyder, 144 Texas 134, 189 S. W. (2d) 471, was a case in which the owner of land conveyed it to another in trust to sell and convey for a certain amount in cash. The trustee violated the trust by conveying the land for stock of doubtful value in a mining venture. In Mac-Donald v. Follett, 142 Texas 616, 180 S. W. (2d) 334, one of the parties breached the obligation that he owed to his associate by procuring for himself a one-thirty-second overriding royalty in the renewal of a lease about to expire, in which he and his associate together owned a like overriding royalty. The conduct condemned in Johnson v. Peckham, 132 Texas 148, 120 S. W. (2d) 786, 120 A. L. R. 720, was that of one of the partners in purchasing the other partner's one-half interest in the entire enterprise for $1,500.00 without disclosing the fact that negotiations were then pending for the sale of all of the property for a consideration of $10,500.00.

It has been held in a number of cases that when a joint adventure or partnership has been formed for the acquisition, ownership or development of certain defined property, the equitable rule will not be extended so as to forbid the acquisition, ownership or development by one of the parties for his own benefit of property not embraced in the enterprise and outside of its scope. Dishman v. Umberhour, 194 Ky. 772, 241 S. W. 62; Burgan v. White, 223 Ky. 79, 2 S. W. (2d) 1067; British American Oil Producing Co. v. Midway Oil Co., 183 Okla. 475, 82 Pac. (2d) 1049; Forino Co. v. Karnheim, 240 Mass. 574, 134 N. E. 605; More v. Burroughs, 111 Kan. 28, 205 Pac. 1029; Latta v. Kilbourn, 150 U. S. 524, 14 S. Ct. 201, 37 L. Ed. 1169, 1178. In this case, as has been said, the property embraced in the enterprise was the gas rights under leases of the several tracts of land described in the contract and the assignment, not including Share 4, and the scope of the enterprise was limited by the terms of the contract to drilling gas wells on those tracts of land and producing and selling gas therefrom.

Since the leasehold interest in Share 4, owned by petitioner

when the contract was made, was not included in the contract, the authorities which forbid a fiduciary from obtaining for his own benefit the renewal of a lease of property related to the enterprise do not support the judgment rendered by the Court of Civil Appeals.

Respondent contends that when petitioner acquired from Quinlan the renewal lease of Share 4 and made a contract for the production and sale of gas therefrom, he breached his duty as a fiduciary, because the production and sale of gas from Share 4 would be in competition with and antagnostic to the success of the common enterprise. This contention is based upon the following facts shown by the record: There was but one purchaser of gas produced in the Lopena Field. It could use only a part of the gas that the field could produce, and its contracts permitted it to take gas from each seller's land in the same equitable or ratable proportion that it took gas from the lands and leaseholds of others in the field from whom it was purchasing or might thereafter purchase gas. It in fact divided the total quantity of gas that it bought by the number of the producing wells in the field, and bought the same quantity from each well. Whenever the purchaser made connection with a new well the quantity of gas that it took from the other producing wells in the field would be reduced. Because the market was thus limited and the total quantity of gas taken was thus divided, the producing and marketing of gas from Share 4 would reduce the quantity of gas sold from each of the four wells that had been drilled for the joint enterprise. The evidence in the record further shows that all of the gas wells in the field produce from a common reservoir, and that each new producing well reduces both the pressure in the sand and the quality of gas that ultimately can be produced by the other wells in the field.

While the drilling of a well on Share 4 and the sale of gas from it would affect, in the manner above stated, sales of gas from the four wells drilled under the contract between petitioner and respondent, that result would follow from normal and lawful development anywhere in the field. The sale of gas from any new well drilled anywhere in the field by anyone would reduce the quantity of gas sold from the wells drilled by respondent. If respondent's contention were sustained, a trust could be imposed for his benefit upon any interest acquired by petitioner in the production from any gas well drilled in the field. By such use of the equitable rule the written contract would, in practical effect, be changed to include property that it was not intended to affect. Since the contract clearly shows the intention of the par-

ties to it to restrict the scope of the joint enterprise to the ownership and operation of the property described in the contract and no intention to deprive either party of the right to acquire or to operate other property in the filed, there was no breach by petitioner of a fiduciary obligation when he acquired the lease of Share 4 and made a contract for the production of gas from it.

■ Respondent offered parol evidence to prove that before the written contract was executed he told petitioner that he would not be interested in making the contract unless all leases owned by petitioner were included in it, and that petitioner stated or represented to him that he was putting in all of the leases that he owned in the field. The trial court sustained petitioner's objections that the parol evidence was inadmissible, because all prior negotiations were merger in the written contract, and that the evidence offered was an attempt to alter, vary and contradict the terms of the written contract. The evidence was admitted for the jury's consideration solely on the issue of malice.

Respondent offered also parol evidence that on two different occasions after the contract was made he told petitioner that he had agreed in the beginning "to put in our deal" the lease on Share 4, and the leases on two other tracts owned by petitioner; that petitioner said he had failed to put those leases in because the titles were defective, and made the statement that he was going to clear up the titles and "put them into this deal." The same objections were made to this evidence and were sustained by the court, the evidence being admitted only on the issue of malice.

The trial court's rulings as to this evidence were, in our opinion, correct. The written contract was complete in itself. The evidence, if admitted without the limitation, would tend to alter and contradict the contract and to bring into it a lease or leases other than those to which the contract by its terms was confined. Respondent testified that he and petitioner intended at all times to reduce their contract to writing; that he did not intend to have an oral agreement, or an agreement in part oral and part in writing; and that he had made no effort to reform the contract, had never required any written instrument changing its terms, and was still operating under it.

Respondent's brief in the Court of Civil Appeals contains twenty points of error. That Court, after sustaining the first

point, found it unnecessary to consider the other points. By the conclusions expressed in this opinion points one to nine inclusive are overruled. Two of the remaining points, the eighteenth and twentieth, present questions of fact not within the jurisdiction of this Court, the excessiveness of the actual damages awarded by the jury and the sufficiency of the evidence to support the judgment for exemplary damages. The other points, which neither this Court nor the Court of Civil Appeals has passed upon, raise questions as to alleged errors in the admission of evidence and in the court's charge and in the refusal of requested issues.

The judgment of the Court of Civil Appeals is reversed and the cause is remanded to that Court for decision of the questions presented by points of error numbered ten to twenty, inclusive, in respondent's (appellant's) brief filed in that Court.

Opinion delivered November 6, 1946.

Rehearing overruled December 4, 1946.