**WINN v. WARNER.**

No. 2665.

Court of Civil Appeals of Texas. Waco.

Jan. 23, 1947.

Rehearing Denied Feb. 13, 1947.

C. M. Gaines and Arnold & Cozby, all of San Antonio, for appellant.

Johnson & Rogers, of San Antonio, Mann & Mann, of Laredo, W. H. Kennon and Nat L. Hardy, both of San Antonio for appellee.

TIREY, Justice.

This is the same case decided by this court and reported in 193 S.W.2d 867. The judgment of this court was reversed and the cause remanded to this court by our Supreme Court (see 197 S.W.2d 338), with instructions to pass upon the points of error Nos. 10 to 20 inclusive, in appellant's brief.

Owing to the fact that these assignments assail in part the charge of the court and the verdict of the jury, we quote the pertinent parts of the charge and verdict:

"Question No. 1: Do you find from a preponderance of the evidence that the execution of the affidavit by defendant on January 31st, 1940, and causing the same to be recorded, was the proximate cause of plaintiff being prevented from commencing the drilling or causing to be commenced the drilling of a well for gas on share four prior to June 15th, 1940, or

from drilling and completing or causing to be drilled and completed on share four a well productive of gas in commercial quantities prior to June 15th, 1940? Answer 'Yes' or 'No.' We, the jury, answer: 'Yes.'

"Question No. 2: Do you find from a preponderance of the evidence that the defendant in executing and causing to be recorded in the Zapata County Deed Records the affidavit of January 31st, 1940, was actuated by actual malice? Answer 'Yes' or 'No'. We, the jury, answer 'Yes.'

"By the term 'actual malice' as used in the foregoing question is meant ill will, bad or evil motive, or such gross indifference to or reckless disregard of the rights of others as will amount to a willful or wanton act.

"Question No. 3: When Mr. Winn filed the affidavit dated January 31st, 1940, did he do so in a good faith effort to protect rights which Mr. Winn, in good faith and probable cause believed he had in Share 4? Answer 'Yes' or 'No'. We, the jury, answer 'no.'

"Question No. 4: Do you find from a preponderance of the evidence that on January 31, 1940 a 7/16th overriding gas royalty interest in the Quinlan Lease on Share 4, Porcion 19, did have a market value? Answer 'Yes' or 'No.' We, the jury, answer 'No.'

"By the term 'Market Value' as used in this charge is meant the amount of money that a person desiring to sell, but not bound to do so, could, within a reasonable time, procure in cash for such property from a person who desires to buy, but is not bound to purchase, the property. If you answer Question No. 4 'Yes', then answer Question No. 5, but if you answer Question No. 4 'No' you need not answer Question No. 5.

"Question No. 5: What do you find from a preponderance of the evidence was such market value on January 31, 1940? Answer by stating amount. We, the jury, answer $3———.

"Question No. 6: What sum of money, if any, do you find from a preponderance of the evidence would be the intrinsic value, if any, of a 7/16th overriding gas royalty interest in the Quinlan lease on Share 4, Porcion 19, on or about February, 1940. Answer by stating amount. We, the jury, answer $23,000.00.

"By the term 'intrinsic value' as used in the foregoing question, is meant the true, inherent and essential value, independent of accident, place or person, which value is the same everywhere and to everyone.

"In arriving at the amount, if any, inquired about in the foregoing question, you may take into consideration such net amount, if any, which you may find from a preponderance of the evidence that Thor Warner would have received from the proceeds of the sale of gas from Share 4, Porcion 19, up to the present time, and in addition thereto you may take into consideration such net amount, if any, you may find from a preponderance of the evidence that Thor Warner would have received from the proceeds of the sale of gas from Share 4, Porcion 19, in the future.

"You are further instructed that in determining from a preponderance of the evidence such net amounts, if any, you will deduct from the gross proceeds, if any, which you may find from a preponderance of the evidence would have been received by Thor Warner up to the present time, and likewise deduct from the gross proceeds, if any, which you may find from a preponderance of the evidence would have been received by Thor Warner in the future the sum or sums which you may find from a preponderance of the evidence it would have been necessary for Thor Warner to pay. And you will further deduct from the gross proceeds, if any, you find would have been so received by Thor Warner in the future, such amount of discount as you may find necessary to cause such gross future proceeds, if any, to represent the present cash value thereof.

"Question No. 7: What amount of money, if any, do you find from a preponderance of the evidence, should be assessed against the defendant as punitive or exemplary damages? Answer by stating amount, if any. We, the jury, answer '$11,500.00.'

"By the words 'punitive or exemplary damages' as used in the foregoing question, is meant such damages as are assessed by way of punishment and do not include any element of compensatory or actual damages."

The 10th point assigns error substantially on the ground that the court erroneously placed the burden of proof on the defendant instead of on the plaintiff in Issue No. 4. We overrule this contention.

■ Issue No. 4, as it was originally submitted, was: "Do you find from a preponderance of the evidence that on January 31, 1940, a 7/16th overriding gas royalty interest in Share 4, Porcion 19, did not have a market value? Answer 'It did not have a market value' or 'It did have a market value.'" Appellant's exception to said issue was: "(a) The burden of proof upon the issue rests on the plaintiff, and the way the issue is submitted does not place the burden of proof upon the plaintiff but is so worded that the burden of proof will be either upon no one, neither the plaintiff nor defendant, or would be upon the defendant, to show that the said overriding royalty had a market value." The court, in order to meet such objections, changed Issue No. 4 as shown in the main charge. Appellant did not re-write his objections but merely wrote into his objections that "each of the foregoing objections shall also apply to the court's charge in the final form as read to the jury." Our view is that Issue No. 4, as originally submitted, did place the burden of proof on plaintiff, and since plaintiff objected to this issue and did not tender any issue stating his view of how it should be submitted, we think appellant invited error, if there is error, and that he cannot now complain. See Federal Surety Co. v. Smith, Tex.Com.App., 41 S.W.2d 210, point 16; also Texas Employers' Ins. Ass'n v. Lemons, 125 Tex. 373, 83 S.W.2d 658, point 3. See also 3 Tex.Jur. 1030, 1033, secs. 731, 733, and Supplement 14, sec. 731, p. 191, for collation of authorities. Since there was a conflict of evidence on the above issue, the answer of the jury is binding.

The 11th point is: "The court erred in admitting in evidence, over the objection of the defendant, Exhibit No. 12, which is a certificate of the Railroad Commission showing the production on the Quinlan No. 1 gas well which is located on the said Share 4 involved in this suit, from December, 1940, through March, 1945."

The 12th point is: "The court erred in admitting in evidence, over the defendant's objection, a statement from the Railroad Commission disclosing the production subsequent to June 30, 1940 on three wells formerly belonging to the American Texas Oil Company."

The 13th point is: "The court erred in admitting in evidence, over the objection of the defendant, a compilation made by the plaintiff of the remaining and probable production from Share 4 which may be produced in the future down to the abandonment pressure of 150 pounds."

The 14th, 15th and 16th points assail the instructions in the court's main charge given in connection with Special Issue No. 6 substantially on the ground that the amount of gas that could be produced from Share 4 was unforeseeable, speculative and contingent on human whims and fancies and that it gave the jury the right to speculate what the damages would be in the future and that the true rule applicable to intrinsic value is to ascertain the intrinsic value on the alleged day of the tort, because the tort-feasor is liable only for such damages as could reasonably have been foreseen on the day of the tort, and that said instruction authorized the jury to take into consideration that gas could be produced and sold from Share 4 subsequent to the day of the alleged tort.

The 17th point assails the action of the court in refusing to submit Special Issue No. 17 requested by the appellant, which was a definition for the jury's information as to what is meant by "true and intrinsic value." The pertinent parts of this requested special issue are: "The term 'actual value' has the following meaning: The 'actual value' of a property, at any particular time, means its true intrinsic value. By 'true and intrinsic value' is

meant such value at the particular time in question, as a person of ordinary care in the exercise of ordinary care and reasonable diligence, and who is reasonably qualified by knowledge of the property and by experience to form a reasonably correct opinion, would place thereon."

Plaintiff's cause of action is one for slander of his title by virtue of the affidavit dated January 31, 1940, filed by Winn on February 1, 1940 in the county where the land was located, in which affidavit Winn set out substantially that he had a two-thirds interest in the lease (the pertinent parts of the affidavit are shown in former opinion of this court in 193 S.W.2d 867), and plaintiff sought to recover both actual and exemplary damages. The testimony tendered in this cause is voluminous and complicated and it would not be practicable for us to set it out in detail. Although much of the testimony in this cause is carefully and accurately stated in the former opinion of this court and the opinion of the Supreme Court, 197 S.W.2d 338, we think it pertinent to state that Winn had been engaged in the oil and gas business approximately 15 years for himself and prior to that time worked for an oil company. He educated himself for a lawyer and "other things" and had received a license to practice law "twenty-five or thirty years ago." It is without dispute that the discovery well in the Lopena Field was drilled in 1934 and had been in production continuously since that time until the trial of this cause in May, 1945. In 1936, Warner and Winn began their negotiations with reference to the lease contract executed in February, 1937. (This contract is set out in full in our former opinion heretofore cited). Winn completed his first well under the contract in March or April, 1937, which was a producer, and two other producing wells were drilled by Winn under the contract prior to January 31, 1940. The Quinlan lease owned by Warner went into effect on June 14, 1939 and expired June 15, 1940. (It was a renewal lease). Warner had a contract with Staggs to drill a well on the Quinlan lease and had selected the location for that well but such well was not drilled because Winn filed the affidavit. Warner was unable to get any one else to drill the well because of the filing of the affidavit; he was financially unable to drill it himself, and Winn refused to execute a release to remove the cloud from the title caused by the filing of the affidavit, and Warner lost the lease; thereafter the property was leased by another party and Staggs drilled the No. 1 well on this property in October, 1940, taking about 15 days to drill the well and such well had been in production from December, 1940 down to the date of the trial. Warner testified to the effect that he was a geologist by education and profession and had worked in the oil business since 1898; that he became acquainted with the Lopena gas field in 1919 and had been connected with the field since 1932; that on January 31, 1940 there were 10 known gas sands in the Lopena Field; that there were three producing sands in the field at that time; that on January 31, 1940 there were 13 wells and there are 22 now; that sand No. 3 spreads over the entire field; that the Winn-Warner Vela Well No. 2 was drilled in March or April, 1937, in sand No. 3 and it was producing in January, 1940 from sand No. 3 and was later deepened to sand No. 4; that sand No. 2 had four or five producing wells on January 31, 1940, and sand No. 3 had six producing wells on January 31, 1940, and sand No. 5 was a producing sand; that the gas pressure in sand No. 3 in November, 1940 was 815 pounds, that the pressure in December, 1944 was 541 pounds; that there were two wells in sand No. 3 on February 2, 1937; that there were five wells producing gas in sand No. 3 on June 15, 1940, and three of these five wells were on the Winn-Warner lease; that from June 15, 1940, to December, 1944, three additional wells had been drilled in sand No. 3; that from the time of the drilling of the last two wells down to December, 1944, Winn and Warner had sold about 15,000,000,000 cubic feet of gas. Warner further testified: "The Quinlan well has produced slightly over a billion cubic feet, and is the same sand thickness as the No. 3. The production from the Quinlan well being less than half as old as production from the other, it of course has produced less in cubic feet, but the value will be the same. Its production to date is possibly a 500,000 cubic feet

per acre foot. These wells are old. Their full productive life is indicated, and most of them are from the beginning of the field. All the figures given here are the 100 per cent life from the beginning of the field to date." He further testified that he had made a calculation as to what he would have received from the Quinlan lease under the terms of his contract with Staggs if he had completed his well on the Quinlan lease, and after detailing the mathematical calculation he said his net balance would have been $19,300; that the well had not been exhausted as yet and it would continue to produce indefinitely in the future. Such estimate was based on production from the third sand alone. This well, in the month of April prior to the trial of the case (May, 1945), sold 18,000,000,000 cubic feet of gas. It was without dispute that the selling price from the field was three cents per cubic foot. Warner testified to the effect that on January 31, 1940, there were about a dozen producing wells in the Lopena Field. He testified without objection to the effect that the Lopena Field had produced 54,000,000,000 cubic feet of gas up until about a month before the trial of this cause and that the Quinlan well on Share 4 (41.-66 acres) had produced "very close to $800.00 worth of gas per acre."

The Quinlan lease was undeveloped at the time Winn filed his affidavit and it was 900 feet from the Winn-Warner Ramirez lease, on which tract Winn and Warner had drilled a producing well; that such lease was the second highest tract in the field and one of the most desirable, and that it was more advantageous to be high on the structure, because gas seeks the highest point to which it can migrate and lodge itself.

Winn testified to a conversation he had with Warner with reference to a map of the Lopena Field a day or two after March 8, 1937. Winn said: "I laid the map down before him and I asked him if he owned that acreage, pointing to Share 4, or rather Shares 3, 4 and 5, and another tract over at the west side of the block, and he said he did. And I said, 'You agreed to put that in our deal at the beginning. You agreed to put in all of your acreage,' and he said,

'Well, it is in there, if you want it, it is in the deal.' He said, 'The title is bad on some of it and I did not think you would want it.' I said, 'I wanted everything that was on this structure like we agreed on in the beginning.'"

■ The rule for assessing damages arising from tort action is stated by our Supreme Court in Seale v. Gulf, C. & S. F. R. Co., 65 Tex. 274, point page 278, 57 Am. Rep. 602: "When a defendant has violated a duty imposed upon him by the common law, he should be held liable to every person injured, whose injury is the natural and probable consequence of the misconduct; and that the liability extends to such injuries as might reasonably have been anticipated, under ordinary circumstances, as the natural and probable result of the wrongful act. McDonald v. Snelling, 14 Allen [Mass.] 200 [92 Am.Dec. 768]; Barron v. Eldredge, 100 Mass. 455 [1 Am.Rep. 126]; Kellogg v. Chicago & N. W. Ry. Co., 26 Wis. 223, 278 [7 Am.Rep. 69]."

■ In Humble Oil & Refining Co. v. Wood, Tex.Com.App., 292 S.W. 200, 201, points 2, 3 and 4, we find:

"The general rule is that the wrongdoer is liable for any injury which is the natural and probable consequence of his misconduct. Such liability extends not only to injuries which are directly and immediately caused by his act, but also to such consequential injuries as, according to the common experience of men, are likely to result from such act. Except as to willful or wanton torts, the converse of this rule is also true, and the wrongdoer is liable only for the natural and probable consequences of his act.

"In the case of torts not amounting to willful or wanton wrongs, the general rule is that the wrongdoer is liable only for such consequences as were or should have been contemplated or might in the light of attending circumstances have been foreseen, or such as according to common experience and usual course of events might reasonably have been anticipated. The wrongdoer is also liable for the natural and probable consequences of his act or omission, although their particular form or

character was not foreseen or anticipated; and it is not necessary that the particular consequences shall have been within the contemplation of the wrongdoer. 17 C.J. 746, 750."

See also 13 Tex.Jur. 75; 25 C.J.S., Damages, § 23, p. 480. In Hughes v. City of Austin, 12 Tex.Civ.App. 178, 33 S.W. 607, 610, it is stated: "The theory of recovery of consequential damages that arise from torts is not based upon injuries and damages that are within the contemplation of the wrongdoer when the tort is committed, but recovery may be had for all damages which are the natural and proximate consequences of the wrongful act, and as to such consequences he is put upon contemplation of the results that are likely to follow from his conduct, although in fact he may have no actual knowlege that such consequences may result. 3 Suth. Dam. 385; 1 Suth. Dam. 20 and 21; Moore v. K'ng, 4 Tex.Civ.App. [397] 403, 23 S.W. 484; 5 Am. & Eng.Enc.Law, 6–9, and notes."

Applying the above rules of law to the conduct of Winn, we think that it is obvious that there was no error in the trial court permitting plaintiff to show the gas production on the Quinlan No. 1 well, and point 11 is overruled. Nor do we think it was error for the trial court to permit plaintiff to show the production on three other wells in the field formerly belonging to the American Texas Oil Company. Winn was an experienced oil operator and had been a producer of gas in this field since March or April, 1937, and he knew that by the filing of the affidavit that it would in all probability prevent Warner from developing the Quinlan lease and that it would force Warner to make the Quinlan lease subject to their contract of February 2, 1937, or lose the lease. From Winn and Warner's common experience of producing gas in the field and from Winn's knowledge of the structure of the Quinlan lease and its location in the field and its proximity to production, he could reasonably anticipate production and loss to Warner, because if he had an interest in the lease according to the view expressed in his affidavit he would have two-thirds of the net

profits, whereas Warner would have only one-third, and under the lease contract which Warner had made with Staggs for drilling the property he was entitled to one-half. Otherwise, he would not have prepared and filed the affidavit and he would have executed the release to remove the cloud from the title. Nor do we think the trial court committed reversible error in admitting in evidence, over appellant's objection, testimony with reference to the production of gas from three wells formerly belonging to the American Texas Oil Company in said field subsequent to the year 1940. The evidence complained of shows the production of each of these wells beginning with the last four months of 1935, continuously through the first eight months of 1942, Warner having testified to the effect that these wells were in production in January 31, 1940, one being in sand No. 1, one in sand No. 2, and one in sand No. 3. Since Winn had been a producer of gas in the field since March or April, 1937, such testimony, we think, was admissible on the theory of the doctrine of foreseeableness and anticipation. Moreover, we think the testimony complained of was cumulative only, and since Warner testified to the effect that if Staggs had been able to drill the well for him, his net profit up to the time of the trial would have been $19,300, and since there was further evidence to the effect that there were 10 known gas sands in the field and that three were in production, and since sand No. 3 would produce indefinitely, we believe that such testimony if error, was harmless in view of all the evidence and the verdict of the jury as to actual damages, and accordingly, the 12th point is overruled. We also think that under the evidence adduced that it was not error for the trial court to permit the defendant Warner to make compilation of the probable production from Share 4 which may be produced in the future down to the abandonment pressure of 150 pounds. According to Warner the Quinlan No. 1 had produced to the date of the trial gas of the net value to him of $19,300, and it was without dispute that sands Nos. 1, 2 and 3 were producing on January 31, 1940, and that sand No. 3 was not yet exhausted, and there was testimony to the effect that it

would continue to produce indefinitely in the future. The record shows that Warner was a competent witness by reason of his education and experience in this particular field, and defendant's objections go only to the weight of this testimony. It is our view that the future injuries to Warner flowing from the filing of the affidavit were not unforeseeable and, speculative and too remote for the jury to take into consideration at arriving at the intrinsic value, and accordingly the 13th point is overruled. It follows from what we have said above that we see no merit in appellant's 14th, 15th and 16th points and they are also overruled.

The 17th point complains of the definition in the court's main charge of what is meant by "true and intrinsic value" and the failure of the court to give the definition requested by appellant. We overrule this point. This is substantially the definition given by Ballantine's Law Dictionary, p. 680. Such definition was expressly approved by this court in the case of Ohio Casualty Ins. Co. v. Stewart, Tex. Civ.App., 76 S.W.2d 873, point 7, at page 878, writ dismissed; see also 48 C.J.S. p. 752; Vol. 22, Words and Phrases, Perm. Ed., pp. 478, 479. It is our view that when the requested definition is carefully read in the light of the evidence adduced in this case, that such definition is more favorable to the appellee than the one given. Appellant's 17th point is overruled. Because of the views heretofore expressed of testimony adduced, we do not think the sum of $23,000 awarded as actual damages is excessive, and appellant's 18th point is overruled.

Appellant's 19th point assails Question No. 7 of the court's main charge, which issue submitted exemplary damages to the jury, and the burden of this point is that said issue No. 7 assumed that the jury would and should assess exemplary damages and that the trial court should have asked the jury to make a finding on an issue as to whether, in the jury's discretion, it should assess exemplary damages against defendant. We overrule this contention. The jury found that Winn was actuated by malice in executing and recording the affidavit and that he did not file the affidavit in good faith effort to protect rights which he in good faith and upon probable cause believed he had in Share No. 4. Since our Supreme Court has held that Winn had no right, title or interest in and to the Quinlan lease by virtue of his written contract with Warner, and further held that Winn could not establish any interest that he claimed in said lease by parol evidence, Winn stands before the court barefooted and stripped of all defenses pleaded by him to the plaintiff's cause of action except his general denial and that he acted in good faith and without malice, and these the jury decided adversely to him. Our view is that Issue No. 7 correctly submitted the issue to the jury. It follows that appellant's 19th point must be overruled.

Appellant's 20th point is: "The court erred in awarding appellee exemplary damages since the evidence is insufficient to support a judgment for exemplary damages in this case." Appellant says: "There is no evidence of any ill will or ill motive other than the filing of the affidavit itself, which is not sufficient to show, of itself, ill will or malice * * *." We cannot agree with this contention. There is evidence to the effect that Warner and Winn had been having some friction in their business relations since shortly after they got production on the Winn-Warner leases, and Warner testified to the effect that Winn had become very unfriendly toward him since July, 1939 and that Winn's "behavior was such that he very plainly indicated to me that he was mad." The affidavit that Winn filed with reference to his interests in the Quinlan lease was based on his agreement with Warner of February 2, 1937 and among other things the affidavit stated that "such agreement being made and entered into with the understanding and agreement on the part of both parties that such interest would be assigned in all of the leases held or owned by the said Thor Warner in such Porciones." Warner testified that he did not make any such agreement either orally or in writing and the agreement of February 2, 1937 did not so provide, but on the contrary "the contract expressly provided that the contract and the assignments together constituted the full agreement between the parties."

Warner's Quinlan lease by its terms provided among other things that it should expire by June 15, 1940, unless a well was drilled and production had on or before said date; that after Staggs discovered Winn's affidavit of record and notified him (Warner) that he could not drill the well under his contract with him because of the affidavit; thereafter he made agreements with two other contractors for the drilling of a gas well on Share 4 and both refused to drill because of Winn's affidavit; that he first learned about Winn having filed the affidavit about March 16, 1940, and that he had a conversation with Winn after that date (the Sunday before Easter, 1940), and in reference to this affidavit "I asked Winn to remove the cloud on the title to Share 4 because I wanted to get the property validated and save it from forfeiture. * * * Q. What did he tell you? A. He said, 'I will knock your damn block off.'"

■ But appellant says that Warner cannot recover exemplary damages because of the rule of law stated in Humble Oil & Refining Co. v. Luckel, Tex.Civ.App., 171 S.W.2d 902, 906, wherein it is stated: "It is also well settled that a claim of title does not constitute malice where such claim is made under color of title upon the advice of attorneys, or upon reasonable belief that a party has title to the property acquired." We do not think such rule of law is applicable to the factual situation here, because of the opinion of the Supreme Court in this cause. There is no evidence in the record to the effect that Winn relied upon legal advice in the preparation of the affidavit nor the filing of the same for record. It is true that the record shows that he had the benefit of legal counsel in the preparation of the contract of February 2, 1937, and that Mr. C. M. Gaines represented him in that transaction. It is also true that the affidavit shows that he executed it and swore to it before C. M. Gaines, but there is nothing in the record to show that C. M. Gaines, before whom he executed the affidavit, was the same C. M. Gaines, attorney, who represented him in the closing of his contract of February 2, 1937 with Warner, nor is there any evidence that he executed the affidavit on the advice of Gaines or any other attorney. Since Winn's good faith in executing the affidavit and filing it for record upon the advice of legal counsel was an affirmative defense against plaintiff's claim for exemplary damages, the burden was on him to plead and establish such defense as well as to see that such defensive issue was submitted to the jury. This he failed to do. We think the issue of exemplary damages was raised by the pleadings and the evidence and that the evidence is sufficient to support the jury's verdict, and the 20th point is overruled.

Accordingly, the judgment of the trial court is affirmed.