**Jack F. RITTER, Sr., Appellant,**

v.

**Leon KENDRICK d/b/a Leon's Tile et al., Appellees.**

**No. 11909.**

Court of Civil Appeals of Texas, Austin.

June 7, 1972.

Rehearing Denied July 5, 1972.

Robert C. (Lou) McCreary, Austin, for appellant.

E. B. Fuller, Austin, for appellees.

O'QUINN, Justice.

This lawsuit is a controversy between the owner of a residence, built in 1968 and

1969, and two craftsmen who worked on the house and furnished materials.

Jack F. Ritter, Sr., owner of the house, brought suit against Leon Kendrick, doing business as Leon's Tile, alleging breach of contract to furnish certain Formica work and for slander of Ritter's title based on Kendrick's filing of his mechanic's and materialman's lien.

Kendrick answered and filed a counter-claim for $1,467.52 plus attorney's fees.

Ritter subsequently brought a third party action against Harry D. Johnson, who had performed carpentry and various services, including acting as a go-between for Ritter in dealing with the various craftsmen during construction of the house. Ritter sought indemnity against Johnson, in event Kendrick should establish his counterclaim, alleging that Johnson negligently failed to inform Ritter that Kendrick's work would exceed $645.80.

Johnson answered and brought a counter-claim for $1,596.90 for extra labor and for attorney's fees. Ritter then claimed the right to a credit against Johnson for sums Ritter claimed he had paid in excess of $5,771.40, the price for which Ritter alleged that Johnson agreed to perform the carpentry and other services.

Based on a jury's answers to special issues, the trial court entered judgment denying Ritter all relief, either as plaintiff or as cross-defendant, and awarding Kendrick judgment against Ritter for $1,623.61 plus attorney's fees of $1,500 and awarding Johnson recovery from Ritter of $1,471.49 plus attorney's fees of $300.

Ritter has appealed and brings sixteen points of error. We will overrule all points of error and affirm the judgment of the trial court.

Under the first three points of error Ritter complains that the trial court refused to allow him an offset against Johnson for "monies paid in excess of the original contract" between Ritter and Johnson.

The original contract Ritter relies on consisted of a sheet of paper signed by Johnson and initialed by Ritter listing seven items of "carpenter labor" totaling $4,771.40, with the additional notation, "Plus $1,000." The paper was dated July 30, 1968, and shows by its heading that the items and figures pertain to "3002 Scenic Dr.," the address of the residence Ritter later constructed. No reference was made in the memorandum to plans and specifications for the proposed building. The record shows that additional oral agreements were made between Ritter and Johnson from time to time before and during actual construction. Oral testimony was employed by the parties at the trial to explain the meaning of "Plus $1,000" in the writing.

Ritter testified by deposition that when the paper was signed by Johnson the architect's plans for the house were not complete and were not "finalized" until after the carpenter work had been started two or three months later, either in September or October.

Ritter stated that he ". . . had an arrangement with Harry Johnson for labor and assistant supervision contract . . . [with] certain services to perform as a supervisor." Ritter testified that Johnson was not a general contractor "as the term is generally used" and that Johnson could hire labor done only with Ritter's approval and upon Ritter's instructions, although Johnson did have authority to hire "his own labor to carry out his own subcontract." Ritter characterized Johnson's functions as, "One, to supervise and assist me as a supervisor. The other . . . to do the carpenter contract part of the work . . ."

Ritter tried his claim against Johnson on the theory that their contract was for a "turn-key job." It is clear from the record that the contract between Ritter and Johnson, consisting of the paper dated in July of 1968 followed by numerous oral agreements, was not for a "turn-key job" as that

term is used in construction work. A turn-key job is defined as, "Any job or contract in which the contractor agrees to complete the work to a certain specified point, and to assume all risk." (Webster's New International Dictionary, 2nd ed., unabridged, 1954)

Ritter by his own testimony was in charge of the job, and Johnson at most was an assistant, subject to Ritter's instructions, and without authority to hire other than carpenter labor without Ritter's approval. Johnson's assumption of risk was limited to performing the carpentry in a good and workmanlike manner and to carry out Ritter's instructions as assistant supervisor of the job.

Though Ritter's officer manager, who kept records of expenses on the job, a recapitulation of payments was admitted in evidence. It was shown that in addition to payment of $5,750 to Johnson, payments of $170.80 for sheetrock and $400 for Formica work had been made to Johnson. Payment of $800 was also made to another carpenter, T. L. McCarty. All such payments totaled $7,120.80. By subtracting the amount of Johnson's first bid, dated in July of 1968, the office manager showed in her recapitulation "over-payment to Johnson" in the sum of $946.10, which calculation forms the basis of Ritter's claim of an offset against Johnson.

The office manager admitted her lack of familiarity with the plans and specifications for the residence and with changes or alterations in the plans. Ritter testified that much of his dealings with Johnson were by telephone at night or in person on the job. The office manager said she was not present when Johnson and Ritter made the memorandum of July 30, 1968, several weeks before work started.

Ritter admitted that changes were made in the course of construction. Johnson's testimony is undisputed that numerous changes and alterations were ordered by Ritter which were in addition to the "Finalized plans and specifications." Johnson's

verified claim listed fifteen items, the largest being for changing from mahogany panels to birch panels in five areas in which mahogany had been specified in the original plans. This alteration in the den, bar, kitchen, butler's pantry and kitchen hall required 168 additional man hours of labor amounting to $794.

After completing all carpenter work called for in the plans, as well as fifteen changes and additions included in his counterclaim, Johnson left the job early in February, 1969. At that time, he testified, all ". . . carpenter work that is on the plans and specifications was a hundred per cent complete." When he left the job, Johnson was working on "the ceiling inside the flower room," an item not "on the original specifications."

Johnson did not know who completed the work on the ceiling of the flower room and the other additional work that Ritter had told Johnson would be done, including a closet at the end of the patio and a water heater closet Ritter's wife wanted built.

Ritter argues that "By the testimony of Appellant's managing officer . . . Appellant proved that he paid out over $900.00 to finish work contracted by Appellee Johnson." We do not find this statement supported by the testimony of the witness, nor do we find any other evidence in the record to make such proof. The office manager testified to additional payments made to Johnson, for sheetrock and Formica work, and to McCarty, but the witness furnished no more than mathematical calculations to arrive at a difference of $946.10 between the grand total and Johnson's original bid, made several weeks before plans were completed by the architect and prior to the numerous changes and additions Ritter ordered during construction. The office manager did not know what the plans included and was without knowledge of changes and additions. Johnson's testimony is uncontradicted that Ritter ordered at least fifteen changes and additions, that the work he

had contracted to do under his original bid had been completed by him before he left the job, and that Ritter at that time had under consideration other additions of a substantial nature. Ritter conceded that changes and additions were made varying from the architect's plans.

Ritter requested special issues, which the trial court refused, asking the jury whether Ritter "paid any sum of money in excess of . . . [Johnson's original bid] to finish the construction job . . ." and, if so, how much money. The record is clear that Ritter did pay in excess of $900 above Johnson's initial bid, but such payments were for additions not included in the architect's original plans. The jury found, in response to issues which the trial court did submit, that ". . . Johnson performed and furnished labor in the construction of the Ritter home over and above that called for by the plans and specifications for such home . . ." and that the reasonable value of such labor was approximately $1,200. Even if Ritter's requested issues had been submitted and the jury had found that Ritter had paid some $900 over and above Johnson's initial bid, such findings would not have supported Ritter's claim of an offset.

■ The trial court properly refused Ritter's requested issues. Ritter failed to adduce evidence of probative force in support of his claim to an offset, and was not thereby denied the right of trial by jury guaranteed by the Texas Constitution. Texas and Pacific Railway Company v. Van Zandt, 159 Tex. 178, 317 S.W.2d 528, 531 (1958).

Under his fourth point Ritter urges error of the trial court in refusing four requested special issues related to Ritter's suit against Kendrick for slander of title resulting from the filing of a mechanic's and materialman's lien.

The assignment as presented on appeal complains of the refusal of requested issues "inquiring about Appellee Johnson's [sic] wrongful filing of a mechanic's lien

against Appellant's property." The record does not disclose that Johnson filed a lien. Ritter's arguments under the point of error relate only to the filing of Kendrick's lien. We will consider the point as one directed to the Kendrick lien.

Kendrick installed tile and Formica in the Ritter house and submitted an itemized statement for the Formica and labor on February 21, 1969, in the sum of $1,486.14. Ritter did not pay the account, but on February 27 wrote Kendrick a letter stating that the contract for Formica approved by him "was the cost plus ten percent delivered to the job." Ritter requested Kendrick to furnish the "manufactors [sic] bill establishing the base cost of the formica" and "the exact square footage of formica furnished."

Ritter stated in the letter, "Further I have no comprehension what is meant by material for 202 system formica, therefore I am asking for an explanaination [sic] and the manufactors [sic] document of cost." The "202 system formica" referred to by Ritter was a type of Formica new in the industry which Ritter's wife had seen advertised and wanted installed in the house under construction. Factory experts from Houston went on the job and instructed Johnson and Kendrick's workmen in the approved method of installing the new system. Ritter instructed Johnson to obtain the "202 system" from Kendrick but told Johnson to install the panels instead of Kendrick. Kendrick's price for the materials, as stated by Ritter in his letter to Kendrick, was cost plus ten percent.

After receiving Ritter's letter, Kendrick "on different occasions . . . attempted to call" Ritter but was told that Ritter was out. Kendrick left his name and number and asked that Ritter call him back. Kendrick did not hear from Ritter further until a second letter arrived, dated more than two weeks after the first. In the second letter Ritter stated in part, "I direct that you comply with my request in that letter [the first], *in order that we may set-*

*tle our account with you.*" (Emphasis added)

Upon receipt of the second letter, Kendrick called Ritter's office immediately. Kendrick testified, "I think in a matter of three or four minutes that we could have worked out all the problems . . ."

Kendrick described this telephone call in the following testimony:

"Q What happened when you called his office?

"A Well, the last time I called his office, his secretary answered the phone, and she apparently forgot to put her hold button—her telephone on hold, because she turned and asked what I assume was Mr. Ritter, did he want to talk to me, and he said no, tell him that I am out of town for two weeks.

"Q What did you do then?

"A Well, as soon as she came back on the line, I told her there wasn't any use in her repeating what he said, because I had already heard it, and she said something to the effect that, well, she was sorry he didn't want to talk to me.

"Q What did you then do?

"A Well, I sat there. I hung up the phone, and I was reading these letters still, and shortly thereafter I got my file together, including the letters, which he is only maybe a mile down the road from me, and I took the file and went down to his office to go over the file with him."

Kendrick went to Ritter's office with the file, which included the invoice and other information Ritter had requested. Ritter refused to see Kendrick, and Kendrick described that visit in this testimony:

"Q What happened when you got there?

"A Well, I went in to the receptionist and I told her who I was. * * * And she said, 'What can I do for you?' And I said, 'I would like to see Mr. Ritter,' and I

don't recall whether she called him on the intercom or whether she went back to talk to him on the first occasion, but he told her, and I heard what he said, that he didn't want to see me.

\*   \*   \*   \*   \*   \*

"Q . . . . After that happened, did you make any further attempts to get in touch with Mr. Ritter?

"A No. * * * I couldn't see that there would be any point in it, no."

Kendrick's testimony that he called Ritter's office by telephone and later went to Ritter's office in an effort to talk to him was corroborated by Ritter's office manager. When asked whether Ritter had paid Kendrick, the office manager stated, "He [Ritter] would have if he had gotten an explanation of the bill."

Following his unsuccessful attempts to talk to Ritter about the account, Kendrick consulted a lawyer who prepared and filed a lien for him. Kendrick testified that at that time the Ritter house was near completion and Kendrick believed he would have no legal means of obtaining the money due him if Ritter closed the loan without the lien on record.

The first of the four special issues requested by Ritter in connection with his suit against Kendrick for slander of title was to ask the jury whether Kendrick, in executing and recording his affidavit "was actuated by actual malice?"

Ritter takes the position on appeal that his suit against Kendrick was and is to "remove the cloud on . . . [Ritter's] property," recover cost of removal, and to recover additional damages "caused by Kendrick's malicious filing of a mechanic's lien."

Ritter pleaded that the amount of the lien was contrary to the contract between Kendrick and Ritter, and that the "lien was maliciously filed" to intimidate Ritter "into paying said amount by the threat of having the false and maliciously filed lien

enforced . . . [and that] said lien has slandered . . . [Ritter's] property and diminished" its value.

■ In an action for slander of title the burden is on the plaintiff to plead and prove that the slanderous writing was false and malicious, without which pleading and proof there can be no recovery of damages. Stovall v. Texas Company, 262 S.W. 152, 153 (Tex.Civ.App. Fort Worth, 1924, no writ); Fant v. Sullivan, 152 S.W. 515 (Tex.Civ.App. San Antonio, 1913, writ ref.). The burden was on Ritter to plead and prove that the affidavit Kendrick caused to be filed was false and that Kendrick was actuated by malice in filing the affidavit.

Ritter sought to show, by the opinion testimony of one of the attorneys in the case, that a lien based on an unwritten contract would not be "good against a homestead." No proof was made that the residence under construction was the homestead of Ritter and his wife and that they had no other homestead occupied by them while the new house was being built.

In an effort to prove malice, Ritter relies on Kendrick's admission that he was "a little angry at the office" and was "upset because he [Ritter] wouldn't see me or talk to me." Kendrick testified, "After all, if someone wouldn't talk to you, you couldn't hardly be too normal." When asked whether he was "a little bit hot" when he went to see the lawyer about filing the lien, Kendrick stated, "Oh, no. That was just a momentary thing," and that he had "cooled off" after being at Ritter's office "real quick."

Ritter in the main relies on Winn v. Warner, 199 S.W.2d 560, 567 (Tex.Civ. App. Waco 1947, writ ref. n. r. e.) and First National Bank v. Moore, 7 S.W.2d 145, 147 (Tex.Civ.App. San Antonio, 1928, writ dismd.) in support of his contention that proof was made that Kendrick filed his lien "actuated by actual malice."

In Winn v. Warner the party filing the affidavit had no interest in the oil lease in question. This fact, coupled with extended friction between the parties in their business relations, distinguishes that case from the case before us. In that case when the owner of the lease requested the maker of the affidavit to remove the cloud, the affiant said, "I will knock your damn block off."

In First National Bank v. Moore the parties filing an abstract of judgment knew that the property in question was the separate estate of a married woman and "evidently desired to force appellees to pay off the judgment." Even after a sale was broken off, "appellants refused to lift the cloud . . . but persisted in claiming a lien on her property."

Malice as a basis for recovery of actual damages "should mean that the act or refusal was deliberate conduct without reasonable cause." Kidd v. Hoggett, 331 S.W.2d 515, 518 (Tex.Civ.App. San Antonio 1959, writ ref. n. r. e.).

The jury found in favor of Kendrick in his claim for the "202 system Formica," which Ritter contended was false, and also found that $1,500 was reasonable and fair compensation for Kendrick's attorney in prosecuting the entire claim against Ritter for labor and materials.

■ It cannot be said that Kendrick's conduct in filing his lien was without reasonable cause. After Ritter requested additional information and explanations of Kendrick's itemized statement for work and materials, Ritter deliberately refused to see or talk to Kendrick, although Kendrick made repeated efforts to comply with Ritter's request for more information. Ritter acknowledged in his first letter that he had contracted for materials on a basis of cost plus ten percent, and stated to Kendrick in the second letter that he wanted the information so he could settle his account with Kendrick. Ritter's office manager stated that Ritter would have paid the account if he could have had the information.

After his futile attempts to see or talk to Ritter, Kendrick sought legal advice, after which the lien was filed. The fact that Kendrick admitted being momentarily a little bit angry at Ritter's office fails as proof that Kendrick acted in malice to protect his right to pay for work and for materials furnished Ritter's job, which the record shows to have cost in the neighborhood of $100,000. Under the circumstances it must be said that Kendrick exercised commendable restraint. After he realized that Ritter apparently was determined not to accept any explanation of the itemized statement and settle the account, Kendrick merely pursued the normal course open to every mechanic or materialman who reasonably believes he is about to lose the fruits of his labor or will not be paid for materials contributed to the job.

We overrule Ritter's fourth point of error.

■ Under points five and six Ritter urges error in awarding attorney's fees to Kendrick and to Johnson. Ritter places reliance on the holding in Tenneco Oil Company v. Padre Drilling Company, 453 S.W.2d 814 (Tex.Sup.1970). The holding in *Tenneco* is not controlling in this case.

Ritter was his own contractor in building the residence. Neither Kendrick's work nor Johnson's work was done under what Ritter erroneously characterized as a "turn-key job." We rejected this contention earlier.

Johnson was hired as a carpenter and to assist Ritter in supervising the job. Johnson served as a go-between in dealing with other workmen and subcontractors. Ritter reserved the right, which he frequently exercised, to vary the work, make additions and alterations, to order Johnson instead of Kendrick to install certain areas of Formica, to substitute birch for mahogany in five rooms of the house, and in general to contract and supervise from day to day without limitation of prior agreement or contract. Ritter ordered, or authorized, work to be done from time to time, and in the same manner ordered or required, the furnishing of such materials as he alone deemed necessary.

Kendrick was asked to furnish certain materials and was asked to install some of the materials, both tile and Formica. The fact that he submitted a bid for some of the materials has no bearing on whether the materials furnished come within the meaning of Article 2226, Vernon's Ann. Tex.Civ.Stat. (as amended by Acts 1971, 62nd Leg. p. 1073, ch. 225, sec. 1, effective May 17, 1971).

Both Johnson and Kendrick employed other workmen on the job to perform carpentry or installation of materials. Ritter received the direct benefits of labor done and materials furnished. Both Kendrick and Johnson performed personal services for Ritter, in addition to labor done, and such services also are within the provisions of Article 2226.

In *Tenneco* the two companies had a written contract under which Padre undertook to drill an oil well to a specified depth for Tenneco. Padre furnished tools, equipment, supplies, materials, supervisors, workmen, drillers, and all things and all personnel needed to perform the contract. In the case before us Ritter was his own contractor, hiring and firing, supervising, buying materials, and assuming all risks and responsibilities. The craftsmen such as Johnson and Kendrick who furnished the labor and the people such as Kendrick who supplied the materials for the job were acting within the contemplation of Article 2226 in event the claims for such labor and materials became the subject of litigation. (On "materials furnished," see Pacific Coast Engineering Company v. Trinity Construction Company, 481 S.W. 2d 406 (Tex.Sup.1972).

Points five and six are overruled.

Ritter's points seven and eight, briefed together, are that the trial court erred (7) "in refusing to allow Appellant leave to

file 'Plaintiff's Supplemental Cross-Action Against Harry Johnson . . .'" and (8) "in refusing Appellant's requested Special Issues Nos. 11 and 12 inquiring about the negligence of Appellee Johnson."

Ritter admits that "Even though Appellant's first cross-action against Johnson was legally sufficient, Appellant requested leave to file a supplemental complaint, leave being denied." Apparently the trial court likewise considered Ritter's "first cross-action against Johnson . . . legally sufficient," and within the court's discretion refused leave to file the supplemental complaint. Point seven is overruled.

Point eight fails to set out in full the two special issues requested by Ritter. Nor do we find in the brief that Ritter has stated in full the special issues requested and refused by the trial court. Rule 418, Texas Rules of Civil Procedure, requires that, "If complaint is made of any charge . . . refused, such charge shall be set out in full" in appellant's brief. Because of Ritter's failure to comply with Rule 418, we are not required to review the matter complained of under point eight. Banker v. McLaughlin, 200 S.W.2d 699, 703 (Tex. Civ.App. Beaumont 1947, affirmed 146 Tex. 434, 208 S.W.2d 843, 8 A.L.R.2d 1231).

Ritter groups points nine, ten, and eleven in his brief.

Under point nine Ritter complains that the trial court erred in "overruling Appellant's objections No. [sic] 1 and 2 to the Court's charge to the effect that the Court's definitions of 'implied authority' and 'apparent authority' were (a) unwarranted by the evidence, (b) erroneous as a matter of law, (c) not pleaded, and (d) deprived Appellant of an affirmative defense."

Point ten is that the trial court erred "in refusing Appellant's requested definition of 'apparent authority.'"

Under point eleven Ritter complains that the trial court erroneously refused to grant Ritter's motion for judgment *non obstante veredicto* "because there is no evidence that . . . Johnson had authority to secure materials or labor over $645.80."

The sum of Ritter's complaints is that he did not by his own conduct and actions place Johnson in such position of agency that Kendrick, using reasonable diligence and discretion, could naturally and reasonably suppose that Johnson had authority from Ritter to secure from Kendrick materials and labor for the "202 Formica system."

The jury found that " . . . Johnson had authority from Mr. Ritter to secure from Mr. Kendrick the materials and labor for the 202 Formica System." The jury also found that the reasonable value of materials for the "202 Formica System" plus ten percent, together with labor for the day factory representatives demonstrated installation, was the sum of $742.72.

In submitting special issues upon which these findings were made, the trial court gave the following instruction:

"You are instructed that the authority of an agent to act for a principal may be express authority, implied authority, or apparent authority. 'Express authority' means the authority granted by the principal to the agent expressly by words. 'Implied authority' is such authority as may be reasonably implied from the express authority granted, that is, implied authority embraces authority to do whatever is reasonably necessary and proper to perform the acts or transactions which the agent has been expressly authorized to perform. 'Apparent authority' means such authority as a reasonably prudent person, situated as was Mr. Kendrick, using reasonable diligence and discretion, would naturally and reasonably suppose Mr. Johnson to possess at the time Mr. Kendrick dealt with him."

Ritter objected to the definition of "apparent authority" and offered a definition

which read substantially as that of the court, with the additional instruction: ". . . and you are further instructed that the alleged principal in this case, Mr. Jack F. Ritter, Sr., had, by his actions, to place Mr. Johnson in such a position by his, Mr. Ritter's, conduct and actions."

The trial court's definition of "apparent authority" lacked an affirmative and express relation to the conduct of Ritter as principal. The term has been defined as meaning ". . . such authority as a reasonably prudent man, using diligence and discretion *in view of the principal's conduct,* would naturally and reasonably suppose the agent to possess." (Emphasis added) Great American Casualty Co. v. Eichelberger, 37 S.W.2d 1050, 1052 (Tex. Civ.App. Waco 1931, writ ref.).

Ritter objected also to the court's definition of "implied authority." We do not find fault with the trial court's definition.

Under the facts surrounding Johnson's agency for Ritter in the course of constructing the residence, we conclude that error in the definition of "apparent authority" did not result in harm to Ritter. Nor has Ritter made a showing of harm.

■ A summary of the facts, with some necessary repetition of what has already been stated, is required at this point. To determine the probable effect of the trial court's instruction on apparent authority, without including an affirmative connection with the principal, we have examined the entire record. Levermann v. Cartall, 393 S.W.2d 931, 936 (Tex.Civ.App. San Antonio 1965, writ ref. n. r. e.).

Ritter's office manager testified that Johnson had worked for Ritter on at least three previous construction projects over a period of three or four years, and that Johnson had been employed by Jack Ritter, Jr., on numerous projects, and by Tim Ritter, another son, on two previous projects. The manager testified that the Ritter family had a great deal of confidence in Johnson's ability and integrity.

Ritter testified by deposition that on the Scenic Drive job Johnson "had the authority to enter into a contract according to the agreement that we agreed with between us for the doing for construction of all the Formica work in the residence . . ." and that Johnson "did have the right to contract with somebody else to do that . . ." with Ritter's "approval and he had it and had specific agreement."

Ritter also testified that on Formica for the job ". . . we had no notion of giving the contract to anybody but . . ." Kendrick. "It was never even thought of, I don't believe, to even talk to anybody else. The man had Johnson's confidence and he had my own confidence by reputation. We had no reason to believe he wouldn't do us a proper job, a job on a competitive basis according to our estimates and his workmanship would be good and we would be entirely happy." The record shows that Kendrick had furnished materials and labors on prior residence construction by Ritter with Johnson supervising for Ritter.

As to the wall Formica, it was Ritter's testimony that Johnson "came up with . . . an estimate for Formica . . . approximately a thousand dollars . . . And the bid that I remember was an estimate through Johnson and a clear cut contract . . . [by Kendrick] that he would do the thing on a cost plus ten percent."

As early as September of 1968 Kendrick made a bid through Johnson for "ceramic tile shower only" at $339.20 and "Formica Drains and Tops" at $306.60, a total of $645.80. The tile shower and the Formica counter tops, both work and materials, were furnished by Kendrick. It was not until November or early December that Johnson talked to Kendrick about the "202 system," or wall Formica. Negotiations regarding wall Formica were separate and apart from the earlier bid on ceramic tile and Formica for drain and counter tops.

Johnson corroborated Ritter's testimony that Kendrick agreed to furnish the wall Formica at cost plus ten percent. Johnson testified that the "Formica 202 system," commonly called "wall Formica", as opposed to counter top Formica, "is a completely different process than regular laminated Formica," and that when first consulted, Kendrick had not heard of the "202 system" and indicated he would have to await factory quotations before arriving at an estimate of the price.

After factory representatives from Houston demonstrated the approved methods of installing the wall Formica, Kendrick again told Johnson he would furnish the Formica, which was already on the job site, at cost plus ten percent, but wanted cost plus twenty percent if he should do the work of installing. Johnson testified that he discussed Kendrick's proposal with Ritter.

When Ritter learned that Johnson had witnessed the installation demonstration for a full day, Ritter asked Johnson to do the work. Ritter said, "Okay then. Fire Leon [Kendrick] and his crew off that wall Formica, and you put it up yourself, and I will pay you the price that I have been paying you, prices for doing other jobs . . . other odd jobs." Johnson also testified that Ritter knew in advance that the factory men would spend a day showing Kendrick's crew and Johnson how to install the new type of wall Formica and that Ritter had approved the expense of such work.

In accord with Ritter's instructions, Johnson installed the wall Formica which Kendrick furnished, for which Johnson was paid $400 for labor.

Ritter testified that he negotiated agreements with subcontractors in only "one or two instances" and that "Most of them were by Johnson or in the presence of Johnson because I wanted him to know what was going on. And it was his job to help me. * * * So there was some negotiations on the part of his part at home

and then the fellow would meet us the next morning and so forth. Just routine matters in most any construction job, I believe, would be built by."

With the wall Formica already on the job, part of which had been applied during the one-day demonstration by factory experts, and after Ritter instructed Johnson to fire Kendrick's crew and to install the "202 system" himself, Johnson did the work and Ritter paid for it, accepting the work Johnson did and the materials Kendrick had furnished. After Kendrick submitted his final bill, Ritter wrote Kendrick asking for a factory invoice on the wall Formica, which Kendrick had itemized in the statement. In the letter Ritter stated, *"The contract approved by me was the cost plus ten percent delivered on the job* and based on actual need and requirements of square footage necessary according to the plans and specifications." (Emphasis added) Ritter has not questioned the quantities or the square footage.

Ritter's office manager testified that Ritter would have paid Kendrick's itemized statement, which included the wall Formica for the "202 system," if Kendrick had given Ritter the explanation he requested. Ritter repeatedly refused to talk to Kendrick by telephone, and on Kendrick's last effort at Ritter's office to give Ritter the explanation, Ritter refused to see Kendrick. Kendrick went to Ritter's office for the purpose of presenting the invoice and to give the explanations Ritter had said he wanted.

Johnson's testimony is uncontradicted that Ritter approved purchase of the wall Formica from Kendrick on a basis of cost plus ten percent, and, in fact, is corroborated by Ritter in his first letter to Kendrick in which he stated that he had approved such a contract.

Although Ritter stated in the letter that he had "no comprehension what is meant by material for 202 system formica," the direct evidence is without dispute that Ritter and his wife initiated consideration of

wall Formica, or the "202 system," and Ritter directed Johnson to get prices from Kendrick on cost of materials and for installation. When Johnson told Ritter that Kendrick wanted twenty percent for labor, Ritter instructed Johnson to fire Kendrick's labor crew and to install the wall Formica himself.

Ritter testified that Johnson told him that Kendrick's figure on cost of Formica would be "Approximately a thousand dollars." Kendrick's bid on the Formica and the ceramic tile was dated in September of 1968, a short time after work on the house had been started. The Formica in that bid was for "Drains & Tops" and did not include wall Formica. The matter of wall Formica did not arise until sometime in November, or in early December, after Ritter's wife had become interested in the new "202 system" for walls. When Kendrick submitted his final statement late in February of 1969 the ceramic tile and counter top Formica were listed separately from the items of wall Formica subsequently furnished in December and installed by Johnson in January.

Kendrick's bid in September of 1968, for both tile and counter top Formica, was $645.80, and the component parts of this total were repeated by itemization in Kendrick's final statement in February of 1969. Included with these items was an additional $73 for "add Formica tops," which is not challenged by Ritter, bringing the total for the earlier work and materials to $718.-80.

The additional wall Formica, furnished in December of 1968, also was in the final statement Kendrick submitted, bringing the total bill to $1,486.14, or $767.34 added for the second parcel of work and materials Kendrick furnished.

Neither bid made by Kendrick, in September and in December, was as much as "Approximately a thousand dollars," and, of course, neither portion of the two types of Formica exceeded the figure Ritter testified he expected to pay for Formica. In fact, deducting from the total statement the sum of $339.20 for ceramic tile, not questioned by Ritter, and the $73 extra for Formica tops already mentioned as not in question, Kendrick's total claim for Formica materials amounted to $1,073.94, a figure reasonably close to Ritter's expectation of "Approximately one thousand dollars" which he testified he authorized through Johnson.

Kendrick's two bids were at least two months apart, and the second purchase of Formica was to meet changes and additions Ritter and his wife made after they decided to use the new "202 system" of wall Formica. It is obvious that when Kendrick bid on tile and counter Formica in September, the use of wall Formica was not then contemplated by either Ritter or Kendrick, and the need for the second bid did not arise until after the first materials had been furnished and were installed in the house.

Judicial recognition of apparent authority as the basis of the principal's liability rests upon the doctrine of equitable estoppel which has not been pleaded in this case and is not at issue. Kendrick's position appears to be simply that he dealt with Johnson who had express authority from Ritter to order and accept the materials and labor Kendrick furnished to Ritter's residence job.

■ The jury's finding that Johnson had authority from Ritter to secure from Kendrick the materials and labor for the "202 Formica System" was the only finding justified by the evidence. That Johnson had actual authority from Ritter is supported by the evidence and is not rebutted or contradicted by any evidence of probative force. We conclude that there can be no reversible error in the manner of the submission of the issue or in the accompanying instructions. Greever v. Persky, 156 S.W.2d 566, 569 (Tex.Civ.App. Fort Worth 1941, affd. 140 Tex. 64, 165 S.W.2d 709); Coffey v. Fort Worth & Denver Railway

Company, 285 S.W.2d 453, 461 (Tex.Civ. App. Eastland 1955, no writ).

Points nine, ten, and eleven are overruled.

■ By point twelve Ritter complains that the trial court overruled objections to submission of Special Issues 3 and 4 because these issues inquired of labor, and reasonable compensation for labor, "over and above . . . [the labor] called for in the plans and specifications." Ritter insists that the inquiry should be as to labor "over and above the contract of July 30, 1968," which was the itemized figures Johnson provided prior to the time plans and specifications were completed by the architect. It appears that this point of error is grounded on Ritter's theory that the writing of July, 1968, constituted a contract for a "turn-key job." We have previously discussed this phase of the case and concluded that Ritter tried his case on a wrong theory. We overrule point twelve.

Under point thirteen Ritter brings attention to four requested special issues which he insists presented affirmative defenses. Because Ritter has not complied with Rule 418, Texas Rules of Civil Procedure, by setting out in full the four requested issues, we are not required to review the matters complained of under this point. (See discussion and authorities under point eight above).

■ Under points fourteen and fifteen Ritter urges error of the trial court in allowing counsel for Kendrick to testify that a suggestion of contempt had been filed and to testify that "other continuances had been filed in this case."

In proving up the services performed by him in the case in behalf of Kendrick, Kendrick's counsel stated that after Ritter or his former attorney in the case failed to produce a deposition, the witness "filed what we call a Suggestion of Contempt which is a . . ." At this point trial counsel for Ritter objected, and moved

"the Court to instruct the jury not to consider it for any purpose."

The trial court instructed the jury, " . . . with reference to the matter that has been described here as a contempt procedure, you are instructed and you will not consider it with respect to any matters submitted to you except you may consider it solely for the purpose of determining the legal services rendered by the witness in connection with this proceedings. You may consider it for that purpose and for that purpose only."

We find the court's instruction proper and sufficient to render harmless any effect of the testimony.

■ As to testimony regarding other continuances, Ritter makes no argument, and we consider the contention waived. Points fourteen and fifteen are overruled.

Ritter's sixteenth and final point is that the trial court improperly overruled Ritter's motion for continuance.

The motion for continuance stated that counsel presenting the motion had been employed in the case only a few days prior to trial after Ritter's first attorney had withdrawn from representation. The motion also stated that Ritter's "wife has had surgery several months ago of a serious nature and he must be at home to nurse and take care of Mrs. Ritter."

The record shows that several continuances, only one by agreement, had been granted in the case.

Ritter did not appear at the trial. The record does not disclose that his absence was due to his own or his wife's ill health. Ritter's testimony was by deposition.

Ritter filed suit April 25, 1969, and after several delays and continuances, the cause was brought to trial July 12, 1971.

Kendrick states in his brief, and Ritter has not denied the statement, that " . . . the record shows that Appellant knew no later than late in May or early in

June that a change of counsel would be required."

Grant or refusal of a continuance is addressed to the sound discretion of the trial court, and judgment will not be reversed unless abuse of discretion is shown in denial of a continuance. American Bankers Insurance Company v. Fish, 412 S.W.2d 723, 725 (Tex.Civ.App. Amarillo 1967, no writ), and cases cited.

The record in this case does not disclose that the trial court abused its discreation in overruling Ritter's motion for continuance. Point sixteen is overruled.

The judgment of the trial court is in all things affirmed.