**Jack K. JEANES and J.K.J. Corporation, Plaintiffs-Appellants,**

v.

**Cliff C. HENDERSON and Marilon Minerals, Inc., Defendants-Appellees.**

No. 82–1057.

United States Court of Appeals, Fifth Circuit.

April 25, 1983.

Seay, Gwinn, Crawford, Mebus & Blakeney, Steven E. Clark, Dallas, Tex., C. Wesley Jeanes, Richardson, Tex., for plaintiffs-appellants.

Jones, Day, Reavis & Pogue, David J. White, Roger P. Evans, Dallas, Tex., for defendants-appellants.

Before BROWN, GOLDBERG and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Jack Jeanes and J.K.J. Corporation alleged a violation of § 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5 and asserted pendent state law claims in connection with the sale of Texas oil and gas interests by Cliff C. Henderson and Marilon Minerals, Inc. The district court granted a directed verdict on several of the claims and entered a take nothing judgment following special verdicts. Jeanes appeals. We affirm.

In 1963, Henderson entered into a farm-out agreement with Kewanee Oil Company concerning two oil and gas leases known as the "Lokey-Cartwright" leases located in Parker and Hood Counties, Texas. Henderson received a working interest in the leases for his promise to develop the leases and to pay Kewanee an overriding royalty. He also granted Kewanee a right of first refusal on any sale of his interests. After recording the agreement, Henderson con-

veyed half his working interest to Marilon Minerals, Inc.

Over the next eight years, Henderson drilled six gas wells on the leases and sold the gas to Lone Star Gas Company. In 1971, Lone Star increased the purchase price in exchange for Henderson's promise to obtain additional production by drilling five more wells on the leases. To finance their drilling, Henderson sought an investor. After a month of negotiations, in late December 1971 Jeanes agreed to pay $45,000 and Henderson:

(1) agreed to assign Jeanes a 3/8 working interest in the five wells and the 320 acres surrounding each well less Jeanes' proportionate share of overriding royalty interests.

(2) agreed to bear "drilling, completion, and equipment costs on each well sufficient to attach the same into existing lines."

(3) granted Jeanes the option to participate in any further exploration that "[I] might undertake in and around" the Lokey-Cartwright leases on a 3/8 pro rata cost-sharing basis. This was referred to throughout the trial as the "first option."

(4) granted Jeanes the option to join in the acquisition of any additional producing acreage in the area. This was known as the "second option."

(5) granted Jeanes an "option to purchase all of his Interest should he ever decide to sell his Interest." This right of first refusal was known as the "third option."

(6) bound himself, his heirs, executors, administrators, successors and assigns to warrant and defend the interests granted to Jeanes, his executors, administrators and assigns.

Shortly after the contract was executed, Henderson drilled the five wells, which continue to produce. To obtain a tax advantage, Jeanes transferred his interest in the five wells to J.K.J. Corporation but retained the option rights.

In late 1979, Robert Stallworth, an oilman who owned the production rights to most of the area surrounding the Lokey-Cartwright leases, offered to purchase Henderson's interest in the lease acreage and the pipeline servicing it. Stallworth knew of Jeanes' 3/8 interest in the wells but it is unclear whether he also knew about Jeanes' option rights. Henderson and Stallworth closed the transaction on July 22, 1980, about one week after Henderson told Jeanes about the deal. Jeanes retained his 3/8 interest in the five producing wells.

Jeanes then sued Henderson. Jeanes claimed at trial that the sale to Stallworth terminated his right to participate in future exploration on the Lokey-Cartwright leases and on surrounding areas, his interest in the pipeline laid in early 1972, and his right of first refusal on any sale of Henderson's interests. Jeanes asserted that this sale was: (1) a violation of § 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5; (2) a violation of Tex.Rev.Civ.Stat. Ann. Art. 581–33, (3) common law fraud and statutory fraud under Tex.Bus. & Com. Code Ann. § 27.01; (4) slander of title; (5) a breach of fiduciary duty; and (6) a breach of contract and warranty. The district court granted Henderson's motion for directed verdict on the first five claims. The court submitted to the jury interrogatories relating to Jeanes' rights in the pipeline and in the third option, but refused to submit a special interrogatory relating to Jeanes' contractual rights in the first option. A take nothing judgment on the jury verdict followed.

Jeanes contends on appeal that the district court erred in refusing to submit to the jury his requested interrogatory and in directing a verdict against his claims for violation of federal and state securities law, fraud, breach of fiduciary duty, and slander of title. Finally, he contends that the court erred in admitting both "parol evidence" regarding the third option and expert testimony regarding his asserted pipeline interest. We turn to these contentions in the order presented.·

*Submission of the First Option*

Jeanes requested a special interrogatory inquiring whether "the parties to the '71 Investment contract intend[ed] at the time of execution thereof that the first option regarding future drilling on the leases was to bind the parties, their heirs, successors or assigns." The district court refused to submit this issue, however, ruling that the first option "is a personal thing" and that "whatever [Jeanes] lost by [destruction of the first option] is folded into the third option." Jeanes now contends that the district court should have ruled that the option was a covenant running with the land as a matter of law and that Henderson's sale to Stallworth destroyed the fair market value of the option. Alternatively, he argues that the question whether the option ran with the land presented a fact issue for the jury. Henderson responds that the first option was a personal covenant terminable at his will. Because the attack upon the directed verdicts triggers similar questions regarding Henderson's obligations, we turn to those claims and then return to this claimed error.

*The Directed Verdicts*

Jeanes argues that the district court erred in directing a verdict on his claims for: (1) breach of fiduciary duty; (2) violation of federal and state securities law and common law fraud; and (3) slander of title. Jeanes does not complain of the directed verdict on his statutory fraud claim under Tex.Bus. & Comm.Code Ann., § 27.01. These claims will be examined separately.

Jeanes claimed at trial that the 1971 contract created a "joint venture" and that a fiduciary duty flowed from that relationship. He argued that Henderson breached the fiduciary duty by extinguishing Jeanes' "right" under the first option to participate in future drilling on the Lokey-Cartwright leases. Jeanes limited the breach of fiduciary duty theory to the first option. The second option was not at issue and the third option was submitted to the jury under a breach of contract theory. The district court directed a verdict for Henderson on

this claim, reasoning that the parties were involved in "an arm's length nonfiduciary relationship from the beginning to the end...." Jeanes now urges us either to rule as a matter of law that Henderson owed and breached a fiduciary duty or to remand for a new trial on this issue.

Texas law controls these pendent claims. Looking to Texas, we find that the 1971 contract established a joint venture in the development of the five wells. *See Rankin v. Naftalis,* 557 S.W.2d 940, 944 (Tex.1977) (joint venture arose when defendant sold a fractional interest in an oil and gas lease to plaintiffs). It does not follow, however, that the joint venture to develop the five gas wells encompassed the possibility of additional development addressed by the first option.

■ Texas courts draw the perimeters of joint ventures for the development of oil and gas properties in a pursed manner. This attitude is borne of concerns that include a realization that the financing of drilling ventures already inherently perilous could be further impeded by the increased risk of claimed breaches of fiduciary duty presented by ill defined obligations. *See Rankin v. Naftalis,* 557 S.W.2d at 945; *Warner v. Winn,* 145 Tex. 302, 197 S.W.2d 338, 342 (1946). The language of the Texas Supreme Court in *Warner* is apposite:

> The parties did not undertake to engage generally in the production and sale of gas from the Lopena field. The extent of their enterprise or joint venture was carefully defined by the contract. It contemplated and provided for the development of certain specified and carefully described areas held under certain named and well identified leases.... The subject matter of the enterprise, the property employed in the joint adventure, was those leases, the land described in them, and the gas under the land.

*Id.* 197 S.W.2d at 342. Similarly, Henderson and Jeanes did not join forces for the general development of the Lokey-Cartwright leases. It is undisputed that the leases had been producing for several years. Henderson, to accomplish the specific pur-

pose of obtaining higher prices from Lone Star Gas, planned to drill five specific locations. By its very terms, the primary purpose of the 1971 contract with Jeanes was to provide cash to Henderson for drilling in exchange for a ⅜ interest in the five wells to be drilled and the 320 acres surrounding each well. Jeanes thus invested in a specifically defined development and obtained specifically defined working interests. As a contractual aside, Henderson also agreed that Jeanes could participate "in *any* future Drilling and Exploration that [I] *might* undertake...." (emphasis added). The 1971 agreement thus contemplated the possibility of future development, but no more. Whether or not such future development would be viewed as an expansion of the original venture or the launching of a new venture, the duties attendant upon a joint venture would not come into existence until the future development occurred. We are persuaded that the venture now contended for never came into existence. Jeanes' argument that Henderson owed him a fiduciary duty to preserve the "value" of his option is thus footed upon an expectancy that never occurred. The option, at best, described a circumstance when a fiduciary duty might arise. That it defined a venture that may have come into existence at Jeanes' option had Henderson drilled does not mean that Henderson's decision to drill or to sell his interests without drilling were to be controlled by the exacting standard demanded of a fiduciary. We agree with the trial court that insofar as the exercise of the first option is concerned, Henderson and Jeanes did business at arms-length. On these facts the law required no more. Jeanes was not entitled to rely upon Henderson and should have acted in his own interest. In doing so, Jeanes was free to record the contract if he believed that his option rights actually were covenants running with the land.

■ We also are unpersuaded by Jeanes' claim that Henderson's sale to Stallworth breached any duty to drill additional wells. The unilateral character of Henderson's "obligation" is clearly stated in the contract. By its explicit terms, Henderson in-

curred no obligation unless he chose to drill. It also placed him under no obligation to drill. Not only do we find no such obligation defined by the terms of the contract, we find no other basis in Texas law for implying, in law or fact, such a contractual duty for the benefit of Jeanes. This was an agreement between owners of working interests. We are not here dealing with the duty to develop a leasehold owned by the owner of a working interest to a royalty interest owner. *See, e.g., Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684, 694–95 (Tex. 1959).

Apart from the absence of any contractual or fiduciary duty of Henderson to protect Jeanes' "rights" under the first option, we are uncertain how the sale "extinguished" them. Jeanes' argument seems to be that Henderson was obligated to disclose the option to Stallworth. Yet, while denying specific knowledge of the first option, Stallworth admitted that he was aware of a contract between Henderson and Jeanes. The record also indicates that Stallworth's lawyer had a copy of the 1971 contract in his possession before the closing. Henderson so testified and no one disputed it. While we do not rest our decision upon this puzzlement, we note that even if Henderson owed a fiduciary duty to "protect" Jeanes' option, it was not breached.

■ We return to the claimed error in not submitting to the jury the question of the parties' intent that Jeanes' rights be enforceable against successors. Under our reasoning, Henderson owed and breached no contractual or fiduciary duty. It follows that Jeanes was not prejudiced by the trial court's refusal to submit to the jury the question of the parties' intent to bind succeeding parties. A negative finding by the jury would have foreclosed Jeanes' present argument that Henderson's sale extinguished his rights under the first option. Moreover, given our view of this case, an affirmative finding that the option was intended to bind successors would not have advanced Jeanes' position.

Jeanes also alleged at trial that his interest in the 1971 contract was a security and that Henderson's sale to Stallworth violated § 10(b) and Rule 10b–5 as well as Tex.Rev. Civ.Stat.Ann. Art. 581–33. The district court directed a verdict on these claims, rejecting Jeanes' argument that he was a "seller" for purposes of standing under the federal and state laws. Jeanes acknowledges possession of the ⅜ interest in the five wells but now argues that he was a "forced seller" because the 1980 sale to Stallworth caused a "*de facto* liquidation" and a "fundamental change" of his interest contemplated in the 1971 contract.

The forced seller doctrine originated in *Vine v. Beneficial Finance Co.,* 374 F.2d 627 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), in which the Second Circuit held that a minority shareholder, faced with the choice of either holding stock in a nonexistent corporation or exchanging his shares for value following a short form merger, was a seller for purposes of 10b–5 standing. This court adopted the *Vine* rationale in *Coffee v. Permian Corp.,* 434 F.2d 383 (5th Cir.1970), holding that a shareholder in a corporation about to be liquidated was a forced seller because he had no choice but "to surrender his interest in the corporation and to exchange his shares for cash." *Id.* at 386. *See also Alley v. Miramon,* 614 F.2d 1372, 1385–87 (5th Cir.1981). The court nonetheless limited the reach of the forced seller doctrine in *Sargent v. Genesco, Inc.,* 492 F.2d 750 (5th Cir.1974). We there rejected plaintiffs' argument that the issuance of new shares so diluted their equity as 'to give them 10b–5 standing as forced sellers. Noting that "*Vine's* informing principle . . . is that a shareholder should be treated as a seller when the nature of his investment has been fundamentally changed from an interest in a going enterprise to a right solely for payment of money for his shares," we denied standing to plaintiffs because they still were entitled to an interest in a going concern and were not forced to liquidate their interests. *Id.* at 764–65 (*quoting Dudley v. Southeastern Factor and Finance Corp.,* 446 F.2d 303, 307 (5th Cir.), *cert. denied,* 404

U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971)).

■ Contrary to Jeanes' argument, we conclude that the 1980 sale to Stallworth did not make Jeanes a forced seller. Even if the termination of the option rights can be regarded as diluting his interests, Jeanes still possesses a ⅜ interest in five operating wells and their surrounding acreage. Unlike the shareholders in *Vine* and *Coffee,* Jeanes has an interest in a going concern and never has been forced to liquidate his interest for value. In fact, Jeanes retains a realistic opportunity of selling his interest in the open market. Jeanes' claims properly were dismissed.

■ We also find that the directed verdict on the fraud claims was proper. Jeanes contends that Henderson misrepresented to Stallworth the content of the 1971 contract. Even if true, this allegation does not make out a fraud claim. A plaintiff claiming fraud must show that a false representation knowingly was made to him and that he relied on it to his detriment. *See Stone v. Lawyers Title Insurance Corp.,* 554 S.W.2d 183, 185 (Tex.1977). Jeanes did not prove that Henderson did so.

■ Finally, Jeanes contends that the district court improperly directed a verdict on his slander of title claim. We disagree. To recover for slander of title, plaintiff must show that defendant maliciously made a false statement that disparaged his title and caused special damages. *See American National Bank & Trust Co. v. First Wisconsin Mortgage Trust,* 577 S.W.2d 312, 316 (Tex.Civ.App.—Beaumont 1979, writ ref'd n.r.e.). The trial court directed a verdict for Henderson stating that there was no proof of any malicious false statement. We agree. In addition, the Texas Supreme Court recently examined the damage element of slander of title actions in *A.H. Belo Corp. v. Sanders,* 632 S.W.2d 145, 146 (Tex. 1982), holding that a plaintiff must prove that a specific pending sale was defeated by the slander. Jeanes presented no proof of a pending sale of his interest. The district court properly directed a verdict on this claim.

*The Evidentiary Rulings*

Jeanes does not now attack the jury's verdict on the breach of contract and warranty claims but instead argues that the district court erred in admitting both "parol evidence" to explain the third option and expert testimony to interpret the asserted pipeline interest. We will examine each claim separately.

■ Jeanes claimed at trial that the sale to Stallworth breached the third option that provided him a right "to purchase all of [Henderson's] Interest should he ever decide to sell his Interest." Henderson disputed this allegation, testifying that Kewanee had a right of first refusal on the Lokey-Cartwright leases under the 1963 farmout agreement and that the third option granted Jeanes in 1971 thus could not extend to these leases. The jury agreed with Henderson, answering "no" to an interrogatory inquiring whether "the parties to the 1971 Investment Contract intended that the third option, or right of first refusal, applied to the Defendants' interest in the Lokey-Cartwright leases...." Jeanes now contends that Henderson's testimony constituted "improper parol evidence" that varied and contradicted the 1971 contract. Jeanes also argues that the testimony contradicted the 1963 farmout agreement and the 1980 contract with Stallworth. We look to Texas law for the answer to this question, repeating that the parol evidence rule is not a rule of evidence but a rule of substantive contract law.

■ In doing so, we conclude that Henderson's testimony was relevant. The term "interest" in the third option was not self-defining and was in this sense ambiguous. Henderson's testimony was thus admissible to determine the meaning of the term. *See e.g., United States, For Use of Garrett v. Midwest Construction Co.,* 619 F.2d 349, 352 (5th Cir.1980) (applying Texas law). Otherwise stated, Henderson's testimony did not vary or contradict any terms of the 1971 contract but explained and interpreted them. He testified that the sale of his remaining interest in the Lokey-Cartwright leases was subject to Kewanee's right of first refusal and that the sale of his interest in future acquisitions outside the Lokey-Cartwright leases was subject to Jeanes' right of first refusal.

Jeanes also claimed at trial that he had an ownership interest in the pipeline laid in 1972 and that this interest was extinguished by the 1980 sale. Jeanes argued that the phrase "equipment costs on each well sufficient to attach the same into existing lines" found in the 1971 contract supplied him with this interest in the pipelines. Henderson disagreed and offered an expert's testimony on the meaning of the term "equipment" in the oil and gas industry. The expert testified that equipment means casing, tubing, wellhead equipment, and gathering lines, but not the major transporting lines. The court admitted this testimony over Jeanes' objection and the jury found that the 1971 contract did not provide Jeanes with an ownership interest in the new pipeline.

Citing *Sears, Roebuck and Co. v. Cleveland Trust Co.,* 355 F.2d 705 (6th Cir.1966), Jeanes first argues that testimony about trade usage of the term equipment was inadmissible because both parties to the contract were not members of the oil and gas industry. This argument, however, misstates the law. *Sears* did not hold that both parties to the contract must be members of the trade; it held only that evidence of trade usage is inadmissible when *neither* party to the contract was a member of the trade. *Id.* at 709. At the same time, the court recognized cases allowing evidence of trade usage in which the party claiming the benefit of the usage was a member of the trade. *Id.* Here, Henderson was actively involved in the oil and gas industry.

■ Jeanes also argues that the expert's testimony went beyond an opinion on trade usage to an opinion on the subjective meaning of the contract. As we read the transcript, the expert's testimony was limited to the trade usage of the terms "equipment" and "pipeline." The district court has "wide discretion to admit or exclude expert testimony," *Page v. Barko Hydraulics,* 673

F.2d 134, 139 (5th Cir.1982), and we find no abuse of this discretion here.

For the reasons stated above, we reject the grounds of error raised by Jeanes and affirm the judgment.

AFFIRMED.